837 F.2d 1298
 FW/PBS, INC., Etc., et al., Plaintiffs-Appellants,
v.
The CITY OF DALLAS, Etc., et al., Defendants-Appellees.
John Randall DUMAS d/b/a Geno's, Plaintiff,
Tempo Tamers, Inc., Etc., et al., Plaintiff-Appellants,
v.
CITY OF DALLAS, Etc., Defendant-Appellee.
Calvin BERRY, III, et al., Plaintiff-Appellants,
v.
CITY OF DALLAS, Etc., et al., Defendants-Appellees.
 No. 86-1723.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 12, 1988.
 
 Arthur M. Schwartz, Denver, Colo., for FW/PBS, et al.
 Frank P. Hernandez, Dallas, Tex., for Calvin Berry, III, et al.
 Richard L. Wilson, Orlando, Fla., for Tamers, et al.
 Malcolm Dade, Dallas, Tex., for other appellants.
 David LaBrec, Office of the City Atty., Vol Villasana, Mark O'Briant, Tom Brandt, Dallas, Tex., for City of Dallas.
 Bruce A. Taylor, Scottsdale, Ariz., for amicus curiae--Citizens for Decency Through Law, Inc.
 Appeals from the United States District Court for the Northern District of Texas.
 Before THORNBERRY, GARWOOD and HIGGINBOTHAM, Circuit Judges.
 PATRICK E. HIGGINBOTHAM, Circuit Judge:
 
 
 1
 In the early summer of 1986, the City of Dallas, Texas began to consider the regulation of the effects of sexually oriented businesses upon the community. After study of similar efforts by other metropolitan cities, the City Council passed a detailed ordinance that imposed licensing and zoning restrictions upon sexually oriented businesses. A variety of businesses that would be subject to its regulations attacked the Ordinance in three separate federal suits. Each of the three suits asked the district court to enjoin enforcement of the Ordinance and declare it unconstitutional. The suits were consolidated and the case was submitted for decision on motions for summary judgment filed by all parties. The district court, with exceptions not complained of here, upheld the Ordinance in a detailed written opinion.[1]
 
 
 2
 These plaintiffs appeal urging that the district court erred in two main regards. First, plaintiffs allege that the licensing provisions are content-based regulations, a prior restraint upon activity protected by the first amendment, and invalid because they lack the required procedural protections for such regulation. Second, plaintiffs complain that the court was wrong to conclude that reasonable alternative locations are available for existing businesses forced to move by the Ordinance, an inadequacy that denied their rights under the first and fourteenth amendments. Plaintiffs also make more specific attacks to the Ordinance. They urge that the licensing scheme is unconstitutional because it fails to limit the discretion of the Chief of Police, the licensing official, and because it disqualifies persons based on their criminal record.
 
 
 3
 We are not persuaded that the district court erred in its rejection of the constitutional attack and affirm. Other and more narrow attacks upon specific provisions of this ordinance were also made. We will explain these contentions and our reasons for affirming their rejection in due course.
 
 
 4
 * The Ordinance subjects sexually oriented businesses to zoning and licensing requirements. A business must be at least 1000 feet from another sexually oriented business or a church, school, residential area, or park. Such businesses must also obtain a license issued by the Chief of Police and permit inspection of their premises when open or occupied. A license is not available to persons formerly convicted of specified crimes, such as promotion of prostitution. The Ordinance also requires that viewing rooms in adult theatres be configured to allow visual surveillance by management.
 
 
 5
 The Ordinance recites that its purpose is to promote health, safety and morals, and to prevent the "continued concentration of sexually oriented businesses." It disclaims any purpose to deny "access by adults to sexually oriented materials protected by the First Amendment."
 
 
 6
 The City attorney first presented the Ordinance to the Dallas City Plan Commission. The Plan Commission heard testimony from supporters as well as opponents of the Ordinance. The Commission considered studies of other cities regarding the relationship among concentrations of sexually oriented businesses, crime, and property values but did not conduct studies of Dallas itself. The Plan Commission did, however, consider a study of alternative locations within Dallas for the affected businesses. On the basis of its findings, the Plan Commission unanimously recommended that the City Council adopt the Ordinance.
 
 
 7
 The Council unanimously adopted the Ordinance after making a number of findings. It considered the same studies as well as a study conducted by the Dallas Police Department that concluded that crime rates are 90% higher in adult districts. The Council concluded that public health and safety required regulation of these businesses because they "are frequently used for unlawful sexual activities, including prostitution and sexual liaisons of a casual nature"; because there have been a substantial number of arrests for sex-related crimes near these businesses; and because the evidence that these businesses are associated with "urban blight" and declining property values is well documented.
 
 II
 
 8
 We first examine the district court's exercise of jurisdiction and the standing of the plaintiffs. Seven of the nine types of sexually oriented businesses regulated by the Ordinance are represented by at least one plaintiff. These plaintiffs include adult arcades, adult bookstores, adult video stores, adult cabarets, adult motels, adult motion picture theaters, and nude model studios. Only escort agencies and sexual encounter centers are not before the court, and we do not decide the constitutionality of the Ordinance as it applies to them. Nor do we decide whether the Ordinance constitutionally may reach businesses that sell sexually-oriented reading materials or videos solely for use off the business' premises. Each of the book and video stores before us also offered on-premises consumption of sexually oriented materials.
 
 
 9
 There is no question but that this is a genuine and not a hypothetical controversy. The plaintiffs are subject to the terms of the Ordinance and obedience to its terms will limit business in ways that will result in economic loss as well as a loss of freedom to engage in acts that enjoy some measure of protection under the first amendment.
 
 
 10
 We also are not persuaded that there is a basis for abstention. There were no pending state proceedings, none have been instituted, and we are not pointed to any possible construction of the Ordinance by state courts that might make imprudent our exercise of jurisdiction.
 
 III
 
 11
 Plaintiffs contend that the licensing scheme must fail for several related reasons. First, they argue that insisting on a license for sexually oriented businesses regulates the content of expression protected by the first amendment without the procedural protections of Freedman v. Maryland,[2] and Fernandes v. Limmer.[3] The Ordinance is said to suffer three procedural deficiencies: it places the burden of proof upon the licensee to prove that a license was wrongfully denied; it fails to provide for prompt determination of the appeal; and it fails to provide assurance of a "prompt final judicial determination."
 
 
 12
 We are not persuaded that this ordinance requires such procedural safeguards for its validity. The argument assumes that the Ordinance licensing scheme regulates protected activity in a way that triggers the procedural requirements of Freedman. The ultimate issue in Freedman was the constitutionality of Maryland's motion picture statute. Maryland made it unlawful to distribute or exhibit films unapproved by a Board of Censors. Maryland did not provide for judicial participation or otherwise assure prompt review in its procedure although its board could bar the showing of a film. The court held that this prior restraint can avoid constitutional infirmity only if hedged by procedural safeguards designed to obviate the dangers of a censorship system. The court concluded that these safeguards include the state's shouldering of the burden of persuasion, a "procedure requiring a judicial determination ...," and restriction of prior restraint to the shortest fixed period compatible with sound judicial resolution.[4]
 
 
 13
 We applied Freedman in Fernandes to strike down a regulation of the Dallas-Fort Worth Airport Authority denying followers of the Krishna religion a license to solicit at the airport. We rejected the suggestion that the regulation was sufficiently content-neutral to escape the procedural requirements of Freedman: "Although D/FW's regulatory ordinance purports to be content-neutral, the consequences flowing from a permit denial here are essentially the same as those addressed in Freedman: to an unsuccessful permit applicant, the unavoidable delay posed by judicial review is tantamount to an effective denial of First Amendment rights."[5]
 
 
 14
 A license from the airport authority was necessary in order to solicit for religious purposes in a public forum. There was no finding that the restraint of protected first amendment activity was narrowly tailored to the regulation of any untoward consequences and no findings that the protected conduct had consequences regulable by the state under its police power. Stated more directly, the airport authority was seen as controlling a religious group's access to a public forum without justification. We concluded that Freedman 's protections were required but absent.
 
 
 15
 In Fernandes we did not apply the time, place and manner analysis of Young v. American Mini Theatres, Inc.[6] There the Supreme Court faced a zoning scheme similar to the Dallas Ordinance. It prohibited locating an adult theatre within 1,000 feet of any two other 'regulated uses' or within 500 feet of any residential zone. Although a majority of the Justices voted to uphold the regulation, five could not agree on a single rationale.
 
 
 16
 Four years after our decision in Fernandes, however, a majority of the Supreme Court settled on a time, place and manner rationale for zoning an activity that is sexually oriented but not obscene. In City of Renton v. Playtime Theatres, Inc.,[7] the Court reviewed a zoning ordinance enacted by Renton, Washington that prohibited adult motion picture theatres from locating within 1,000 feet of any residential zone, single or multiple-family dwelling, church, park or school.[8] Characterizing the City of Renton ordinance as a time, place or manner restriction, the Court found the first amendment satisfied because the city had a substantial interest in regulating sexually oriented businesses and did so without restricting alternative avenues of communication.[9]
 
 
 17
 We applied City of Renton to a licensing scheme substantially similar to the Dallas Ordinance in SDJ, Inc. v. City of Houston.[10] On the basis of City of Renton, we upheld the Houston ordinance against a facial first amendment challenge. The opponents of the Houston Ordinance, however, made no attack to the procedural protections in the Ordinance. Nevertheless, the City of Renton and City of Houston decisions guide our analysis of the procedural protections the City of Dallas must provide here.
 
 
 18
 Most important, these decisions recognize that a city may regulate the effects of sexually oriented businesses without engaging in content-based regulation. The City of Renton Court found no reason to apply rigorous content-based analysis where a city's "predominant concern" is to control the negative effects of a certain kind of business rather than to suppress a certain type of speech.[11] In addition, the Court held that sexually explicit materials deserve less first amendment protection than other kinds of speech.[12] In short, to the extent that Fernandes reaches Dallas' present zoning regulation, it is limited by the City of Renton decision; the first amendment protection required for religious activity, including proselytizing and solicitation of money, is of a different order than the protection due sexually oriented businesses.
 
 
 19
 We find that the Dallas Ordinance, like the ordinance before the Court in Renton, regulates only the secondary effects of sexually oriented businesses. For this reason, the Ordinance need only meet the standards applicable to time, place, and manner restrictions and need not comply with Freedman 's more stringent limits on regulations aimed at content.
 
 
 20
 This is not to say that the lower level of protection provided in City of Renton inevitably excludes the procedures required by Fernandes. In this case, however, those procedures were not necessary insofar as the Dallas Ordinance regulates a business engaged in an activity subject only to the lesser protection. Fernandes procedures are less important when a regulation restricts the conduct of an ongoing commercial enterprise. What is being limited here is not a particular movie--as in Freedman--nor episodic solicitation efforts--as in Fernandes--but a long-term commercial business. The ongoing nature of the regulation provides a strong incentive for the business operators to seek review of licensing decisions, even if that review is not given immediately.[13] We do not decide today whether Fernandes procedures apply to lesser-protected activities conducted outside the realm of an ongoing commercial enterprise.
 
 
 21
 We are also satisfied that the ordinance is valid on its face. Because the Ordinance in City of Renton was a content-neutral time, place or manner restriction, the Supreme Court required only that it be "designed to serve a substantial government interest" and allow for "reasonable alternative avenues of communication."[14] The Dallas Ordinance meets both those requirements. Like the City of Renton ordinance, the Dallas law was designed to serve the City's interest in maintaining "the quality of urban life."[15] The City Council's consideration of the criminal effects of concentrated sexually-oriented businesses was thorough, as was its review of the effects such concentrations have on property values. In short, Dallas has demonstrated that the Ordinance furthers a substantial government interest.
 
 
 22
 The Ordinance also allows reasonable alternative avenues of communication. In Basiardanes v. City of Galveston,[16] we held that an ordinance restricting adult theatres to locations that were "poorly lit, barren of structures suitable for showing films, and perhaps unsafe," did not provide adequate alternative locations. Here, however, the City offered evidence that convinced the district court that the alternative sites are feasible locations and not just open areas on a city map. Putting aside the question of the deference the district court owed the findings of the City Council regarding alternative locations, it had evidence before it sufficient to sustain its findings. Plaintiffs suggest that such findings are inappropriate for deciding a motion for summary judgment. Perhaps that is so, and we express no opinion in this regard. However, the parties submitted the case for decision on the record and the record supports the district court's findings regarding the number of alternative locations.
 
 IV
 
 23
 We also are not convinced by the other constitutional attacks against the Ordinance's licensing provisions. Appellants rely on several different constitutional provisions in their challenge: they attack three specific license requirements as prior restraints under the first amendment, they contend that the Ordinance's grant of discretion to the police chief violated the first amendment's prohibition on vagueness, and they argue that the Ordinance's inspectionconsent provision violates the fourth amendment's limitations on searches as well as the first amendment. We deal with these attacks in turn.
 
 
 24
 * As a threshold matter, we note that the City of Renton standard of review applies to the details of the licensing scheme--as opposed to the zoning rules--even though the licensing scheme may regulate aspects of the businesses' operations other than location. The kind of speech affected by the license requirements and the city's justification for enforcing them are the same for both kinds of restrictions. Whether a license is denied because the business is improperly located or because the business is improperly maintained, the effect is the same--the operator must refrain from the activity, and his only alternative is to comply with the Ordinance and obtain a license.[17] Indeed, as the very title of the doctrine suggests, "time, place or manner" analysis cannot be limited solely to regulation of "place."
 
 
 25
 On this basis we hold, in accordance with the prevailing view, that the first amendment does not prohibit the City of Dallas from requiring that viewing booths in adult theatres be open.[18] Although this requirement is based on slightly different considerations than those that support the zoning requirements, the public purpose involved is no less substantial. The City could reasonably conclude that closed booths encourage illegal and unsanitary sexual activity in adult theatres. The substantial government interest in curbing such effects supports the open booth requirement as a valid restriction under City of Renton standards.
 
 
 26
 The owners of adult motels make a separate challenge to the Ordinance provision prohibiting rental of a motel room for less than ten hours at a time. The motel owners allege that the City made no finding that adult motels engender the same effects on property values and crime as do other sexually oriented businesses. Once again, however, we find the City's interest to be self-evident and substantial. It is certainly within reason that short rental periods facilitate prostitution, one of the criminal effects with which the City Council was most concerned.
 
 
 27
 Appellants also attack the Ordinance provision that denies licenses to persons convicted of certain crimes.[19] Arguably, it is awkward to analyze this occupational disability as a time, place or manner restriction within the City of Renton framework. This part of the Ordinance does not simply regulate the manner of protected activity, it denies the right of persons convicted of certain crimes to engage in the regulated businesses.
 
 
 28
 Proceeding in categorical terms sheds little light on the standard of review we should apply, although we can imagine three possibilities. First, we might subject the provision to the strict level of review reserved for content-based regulation and require the city to show that the provision is precisely drawn to serve a compelling interest.[20] Second, we might apply City of Renton 's approach and require that the provision serve a substantial government interest while leaving open alternative avenues of communication. Finally, although the provision might not be considered content neutral, the fact that it impinges on a lesser-protected category of speech might justify the application of some intermediate standard of review, particularly when the regulation is a form of disability commonly attending convictions.
 
 
 29
 A strong argument can be made that we need not determine which standard of review is most appropriate because the provision can in any event withstand strict scrutiny; that the city's findings demonstrate a compelling interest in limiting the involvement of convicted persons in the operation of sexually oriented businesses; that by documenting the strong relationship between sexually-oriented businesses and sexually related crimes, the City established a compelling justification for barring those prone to such crimes from the management of these businesses. The argument would continue that the City's findings conform with the well-accepted notion that the government may attach to criminal convictions disabilities aimed at preventing recidivism.[21]
 
 
 30
 While compelling necessity might be a proper standard to measure regulation disabling a person with full participatory rights of citizenship, on balance we are persuaded that only a substantial relationship need be shown between the conviction and the evil sought to be prevented. The courts have not engaged in such strict scrutiny and have not otherwise required compelling necessity to justify other occupational bars attending a criminal conviction, including those laced with activity protected by the first amendment such as labor organizing. In short, the City need only show that conviction and the evil to be regulated bear a substantial relationship.
 
 
 31
 We agree with the district court that the Ordinance now is well tailored sufficiently to achieve its ends. Ineligibility results only from offenses that are related to the kinds of criminal activity associated with sexually oriented businesses.[22] In addition, the Ordinance permits licensing of former offenders after enough time has passed to indicate they are no longer criminally inclined and takes into account the seriousness of applicant's offenses.[23] The relationship between the offense and the evil to be regulated is direct and substantial.
 
 
 32
 This result also is consistent with our decision in Fernandes. The ordinance challenged in Fernandes denied a permit to anyone convicted of an offense involving moral turpitude. Yet, in Fernandes there was no immediate relationship between crimes of moral turpitude and the purpose of the airport's ordinance.[24]
 
 B
 
 33
 We also agree with the district court that the Ordinance does not give impermissibly broad discretion to the Chief of Police in issuing, suspending, and revoking licenses. Among other things, the Ordinance empowers the Chief of Police to require "reasonably necessary" information in a license application, to deny a license for failure to comply with "applicable [health, fire and building] laws and ordinances," and to revoke a license if the licensee gave "false or misleading information" in the application or has "knowingly" permitted illegal conduct on the premises.[25]
 
 
 34
 As these examples demonstrate, the Ordinance relies on standards that are "susceptible of objective measurement" and thus consistent with the first amendment.[26] The factual basis necessary for each of these determinations is either implicitly obvious, as in what constitutes "false" information or information "reasonably necessary" for an application, or ascertainable through reference to other sources of law, as in what constitutes a violation of health laws or knowledge of illegal conduct.[27]
 
 C
 
 35
 Finally, plaintiffs attack the Ordinance provision permitting the inspection of a licensed business whenever the premises are occupied or open for business.[28] We reject the argument that this provision violates the fourth amendment prohibition against unreasonable searches. Under the administrative search doctrine, searches to enforce regulatory standards may be reasonable in light of the reduced expectation of privacy in a pervasively regulated business.[29]
 
 
 36
 Communities long have been concerned about the effects of sexually oriented businesses and have attempted to cope with those effects through regulation. Indeed, in light of this history of regulation we rejected a facial fourth amendment attack to an ordinance permitting warrantless searches of licensed massage parlors.[30] We hold that sexually oriented businesses face a degree of regulation that renders the inspection provision presumptively reasonable.
 
 
 37
 Nor do we find the inspection provisions unduly burdensome under the first amendment. The power of the City to inspect for violations does not enhance the Ordinance's suppressive effect, for the City may revoke a license only for non-compliance with substantive provisions that we have determined to be consistent with City of Renton standards. Rather, the City has a substantial interest in enforcing the Ordinance, and the inspection provision is well tailored to serve that interest.
 
 
 38
 AFFIRMED.
 
 
 39
 THORNBERRY, Circuit Judge, concurring in part and dissenting in part:
 
 
 40
 As stated by the majority, this case concerns the limits on the manner in which the City of Dallas may restrict the speech of its citizens in its continuing fight against crime and urban blight. Dallas has chosen, as a means of achieving these laudable goals, a system of licensing and zoning of sexually oriented businesses. Because the activities of many of these businesses implicate First Amendment concerns, it is the duty of this court to closely examine these laws. Because I believe the majority has not applied standards consistent with prior case law in its examination of the ordinance, I respectfully dissent from part of the majority opinion.
 
 
 41
 I dissent only with respect to those businesses whose activities directly implicate the First Amendment, such as the adult book stores, adult video stores, and adult motion picture theaters. Because no showing has been made that these businesses in any way involve obscenity, they are entitled to First Amendment protection. See, e.g., Schad v. Borough of Mount Ephraim, 452 U.S. 61, 101 S.Ct. 2176, 2184 n. 10, 68 L.Ed.2d 671 (discussing how Young v. American Mini Theatres, Inc., 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) analyzed the impact on the First Amendment of an ordinance zoning adult movie theaters), 101 S.Ct. at 2186 (holding that nonobscene nude dancing is protected by the First Amendment) (1981). I therefore concur with the majority insofar as it upholds the ordinance as applied to businesses, such as adult motels, whose primary activities are not speech.
 
 
 42
 I also concur with the majority's result in upholding the zoning provisions of the ordinance. I do wish to clarify that I understand the time, place, and manner doctrine as applying only to restrictions like the zoning provisions of the Dallas ordinance. The time, place, and manner doctrine should not apply to the licensing laws[1] if the denial of a license completely bans the speech of the person denied and does not leave the speaker alternative avenues of communication. See, e.g., Basiardanes v. Galveston, 682 F.2d 1203, 1213 (5th Cir.1982) ("A reasonable time, place, and manner regulation restricts speech but leaves open adequate alternative channels of communication to the speaker.").
 
 
 43
 * In Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), the Supreme Court required that the state provide certain procedural safeguards before imposing a prior restraint on speech. First, the state must have the burden of instituting judicial proceedings in which it bears the burden of justifying its actions. Second, some system must assure that any interim restraint imposed pending judicial resolution will be of brief duration. Finally, the state must guarantee swift judicial action. Id. 85 S.Ct. at 739. In essence, Freedman holds that "no forum except a court can be permitted to impose a valid final restraint on expressional activities...." L. Tribe, American Constitutional Law Sec. 12-34 (1978).
 
 
 44
 The Dallas ordinance does not provide for a court to review license denials in the manner required by Freedman.[2] The ordinance places the burden of appealing on the licensee, gives no assurance that the burden placed on one denied a license will be of brief duration, and contains no guarantee of swift judicial action. The denial of a license to engage in speech is, however, the classic prior restraint.[3] Thus, it seems to me, on its face Freedman condemns the ordinance.
 
 
 45
 The majority apparently concludes, however, that Freedman 's procedural safeguards are not needed because the ordinance is content-neutral and because sexually oriented speech deserves only diminished First Amendment protection. The majority attempts to distinguish Judge Williams' opinion in Fernandes v. Limmer, 663 F.2d 619 (5th Cir. Unit A 1981), which applied Freedman to an ordinance regulating the distribution of literature and solicitation of funds at the Dallas-Fort Worth Airport. I believe that Fernandes cannot be distinguished on this issue.
 
 
 46
 The majority first states that, unlike the ordinance at issue now, the Airport ordinance was not "sufficiently content-neutral." But as the Supreme Court has defined that term, both the Dallas ordinance and the Fernandes ordinance are content-neutral. An ordinance is content-neutral if it can be justified by a purpose unrelated to the suppression of particular speech. See Renton v. Playtime Theatres, Inc., 475 U.S. 41, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986) (defining content-neutral speech regulations as those that are justified "without reference to the content of the regulated speech"); Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976).
 
 
 47
 The ordinance at issue in this case is content-neutral because, as the majority points out, it can be justified by a desire to fight crime and urban blight--interests unrelated to the suppression of particular speech. The ordinance in Fernandes, however, was also content-neutral. The purpose of the D/FW ordinance was to prohibit interference with people moving through the airport and to help the flow of pedestrian traffic. See Fernandes, 663 F.2d at 635. Moreover, Fernandes expressly referred to "D/FW's content-neutral permit system." Id. at 627. Thus, the majority's conclusion that Fernandes did not involve a content-neutral regulation is unwarranted.
 
 
 48
 The majority also attempts to distinguish Fernandes by stating that "[t]here was no finding that the restraint of protected first amendment activity was narrowly tailored to the regulation of any untoward consequences and no findings that the protected conduct had consequences regulable by the state under its police power." But Fernandes imposes procedural requirements on even narrowly tailored restraints. The Fernandes court found that some of the substantive provisions of the airport ordinance withstood constitutional scrutiny. Id. at 629 (denial of permit for false statements in permit application), at 636 (denial of permit for interference with pedestrian traffic). Nevertheless, the court still required that the Airport Board adhere to the procedural safeguards when denying a permit. Id. at 628. The majority has not offered any valid justification for the absence of procedural safeguards in the Dallas ordinance. Most of the justifications offered by the majority only relate to the validity of the substantive restrictions the Dallas ordinance places on First Amendment activity. They are irrelevant to the adequacy of the procedural safeguards attending the substantive restrictions--a central concern of Fernandes. The majority never argues, and probably cannot argue, that the absence of procedural safeguards, in addition to the substantive provisions, is narrowly tailored to any identified state interest.
 
 
 49
 In discussing the constitutionality of the absence of the Freedman safeguards, the majority does make one argument that deserves special attention. According to the majority, the procedural safeguards
 
 
 50
 are less important when a regulation restricts the conduct of an ongoing commercial enterprise. What is being limited here is not a particular movie--as in Freedman--nor episodic solicitation efforts--as in Fernandes--but a long-term commercial business. The ongoing nature of the regulation provides a strong incentive for the business operators to seek review of licensing decisions, even if that review is not given immediately.
 
 
 51
 The majority is arguing that the more severe the infringement on a person's First Amendment rights, the less protection that person deserves. Such an argument seems to me to defy common sense. A government cannot avoid the constitutional procedures that safeguard an individual's rights merely by smothering the rights to such an extent that the individual is taunted into fighting back. This dangerous reasoning, which can only serve to encourage governments to impose the strongest possible burden on what they deem to be unacceptable speech, contravenes the precepts of the First Amendment.
 
 
 52
 The majority also attempts to escape Fernandes by arguing that the denial of a license to engage in sexually oriented speech need not be narrowly tailored even if the speech is nonobscene and protected by the First Amendment. The majority argues that this type of speech is entitled to less first amendment protection than other speech, and that to pass constitutional muster, the restraints on this type of speech need be characterized only as reasonable time, place, and manner regulations. In reaching its conclusion the majority relies on City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). A close reading of Renton shows that the language quoted by the majority arises in a different context than that involved in Dallas' licensing scheme.
 
 
 53
 Unlike the current case, which involves an ordinance containing both a zoning system and a substantive licensing scheme, Renton involved a challenge to a zoning ordinance alone. The Court stated that its first step in addressing the challenge was to describe the ordinance as a content-neutral time, place, and manner regulation. Id. 106 S.Ct. at 928. The Court cited Young v. American Mini Theatres, Inc., 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) in finding that "at least with respect to businesses that purvey sexually explicit materials, zoning ordinances designed to combat the undesirable secondary effects of such businesses are to be reviewed under the standards applicable to 'content-neutral' time, place, and manner regulations." 106 S.Ct. at 929-30 (footnote omitted) (emphasis added). The Court described Young as concluding that a state may draw a distinction between adult theaters and other theaters without violating the obligation of content-neutrality toward protected speech. Id. at 930. As Justice Powell elaborated in his concurrence in Young, "the government can tailor its reaction to different types of speech according to the degree to which its special and overriding interests are implicated." Young, 96 S.Ct. at 2458 n. 6.
 
 
 54
 It is in this context that the Court allowed a distinction between sexually oriented speech and other speech. The Court was discussing only whether a state could choose to single out sexually oriented speech from other types of speech without violating its threshold obligation of content-neutrality. The Court concluded that such regulations are content-neutral. Because of that conclusion, and because the ordinance in Renton was a zoning ordinance that allowed alternative avenues of communication, the Court applied the reasonable time, place, and manner review. But nothing in Renton supports the majority's severing of the time, place, and manner standard from its proper context, and applying that standard to this licensing ordinance. This licensing has a far more substantial impact on speech than zoning because zoning leaves open alternative avenues of communication. The denial of a license is a complete ban on speech.
 
 
 55
 I can conceive of a licensing law that would be analyzed as a time, place, and manner restriction. For instance, if a government, to prevent overcrowding, required a person to get a license to use a park at a certain hour of the day, that would be a regulation of the time at which the person may speak. The person, however, would still be allowed to speak, although perhaps at a different time than he original anticipated. The Dallas licensing scheme, however, is a regulation of a different magnitude. It completely prevents certain persons from speaking. It thus does not merely regulate the time, place, or manner in which one may speak, but says one may not speak at all.
 
 
 56
 Naturally, I agree with the majority that the current regulations are content-neutral. The regulations are justified by concerns unrelated to the suppression of speech. I strongly disagree with the majority, however, on the answer to the ultimate question of the constitutionality of the licensing scheme. I would apply a review stricter than mere reasonableness to content-neutral regulations that have the effect of totally banning certain speech. I cannot believe that the Supreme Court intended that all regulations of sexually oriented speech are somehow to be judged as time, place, and manner restrictions requiring only a review as to their reasonableness. Although the Court in Renton was willing to allow a reasonable time, place, and manner regulation that singled out sexually oriented speech, it still required alternative areas for that speech. Surely, however, the Court would more closely examine a regulation of this speech that does not leave any avenue of communication for the speaker.
 
 
 57
 Applying a time, place, and manner analysis to a licensing statute that completely bans certain classes of persons from speaking is illogical. Although the majority speaks of deference to the district court's finding that the ordinance allows for reasonable alternative locations for speech, that finding can relate only to the zoning regulations; it cannot relate to this licensing regulation. A person who is completely banned from speech because, for example, he has in the past been convicted of some crime has no other avenue of communication. Cf. Arcara v. Cloud Books, Inc., 478 U.S. 697, 106 S.Ct. 3172, 3177 n. 2, 92 L.Ed.2d 568 (1986) (distinguishing an order closing an adult book store from an "unconstitutional prior restraint" partly because the party could carry on his bookselling business in other locations). The time at which he may speak, the place where he may speak, and the manner in which he may speak are not merely being regulated; his entire speech is being extinguished. Therefore, when examining the constitutionality of those parts of the Dallas licensing scheme, which, unlike zoning regulations, completely ban a person from speaking, I strongly believe that the First Amendment requires a standard of review more strict than that contained in the time, place, and manner doctrine.
 
 
 58
 In Fernandes, this court advanced persuasive reasons for concluding that Freedman 's procedural safeguards should apply to even content-neutral regulation of speech.
 
 
 59
 Although D/FW's regulatory ordinance purports to be content-neutral, the consequences flowing from a permit denial here are essentially the same as those addressed in Freedman: to an unsuccessful permit applicant, the unavoidable delay posed by judicial review is tantamount to an effective denial of First Amendment rights. Therefore, "[t]he Freedman principle is applicable here."
 
 
 60
 The lack of these procedural protections in this licensing system means that the opportunity to exercise free speech and other associational rights can be postponed for substantial periods of time before adequate review.
 
 
 61
 Fernandes, 663 F.2d at 628 (citations omitted). This reasoning also applies in the current case. When Dallas denies a license to an adult bookstore or movie theater, it impairs the ability to speak. Likewise, a delay in a judicial determination of the propriety of the denial continues that impairment. Under the ordinance, "the opportunity to exercise free speech and other associational rights can be postponed for substantial periods of time before adequate review." Thus, Fernandes and Freedman require the procedural safeguards.
 
 II
 
 62
 I must also dissent from the majority's holdings regarding some of the substantive licensing provisions. Before a license may issue, Section 41-5(a)(6) of the ordinance requires that the premises of a sexually oriented business first be "approved by the health department, fire department, and the building official as being in compliance with applicable laws and ordinances." The Seventh Circuit, however, struck down a similar ordinance in Genusa v. City of Peoria, 619 F.2d 1203 (7th Cir.1980).
 
 
 63
 The ordinance in Genusa, like the Dallas ordinance, was partially motivated by a desire to retard urban blight. Id. at 1214. The Genusa court found, however, that this interest could not justify special safety inspections, stating "there is nothing in the record to indicate that adult bookstores, as a class, contain more faulty light switches or other violations than regular bookstores, as a class." Id. Thus, the court concluded that the ordinance was not shown to further any legitimate interest unrelated to the suppression of free expression. For this reason, the court invalidated the inspection provision. Id. at 1215.
 
 
 64
 Likewise, the City of Dallas has produced no legitimate justification for its prelicensing health, fire, and building code approval requirement.[4] Adult bookstores are, of course, subject to the same health and safety laws as any other business. They may not, however, "be singled out for special regulation unless the city can demonstrate that such action is narrowly devised to further a substantial and legitimate state interest unrelated to censorship or the suppression of protected expression." Id. at 1214. Section 41-5(a)(6) is, therefore, not constitutionally justified. Moreover, following this same reasoning, Section 41-7, which the majority characterizes as "a provision permitting warrantless inspection," should be invalid. See id. at 1221 (striking down provision that required biannual warrantless inspections).[5] That section also relates to burdensome health and safety inspections.
 
 
 65
 I am also troubled by the majority's analysis upholding the provision allowing the denial of a license to persons convicted of certain crimes. Courts have frequently condemned the denial of a license to engage in speech related activities because of a person's criminal history. As this court has stated, "[p]ersons with prior criminal records are not First Amendment outcasts." Fernandes, 663 F.2d at 630; see also Genusa, 619 F.2d at 1219 n. 40 ("We know of no doctrine that permits the state to deny a person First Amendment liberties other than the right to vote solely because that person was once convicted of a crime or other offense."). The majority cites De Veau v. Braisted, 363 U.S. 144, 80 S.Ct. 1146, 1154, 4 L.Ed.2d 1109 (1960) to argue that barring persons with criminal records from certain employment is a common legislative device that needs to pass only minimal scrutiny. However, DeVeau by its own terms applies only to "certain employments closely touching the public interest." Id. 80 S.Ct. at 1154 (discussing sitting on a jury, entering the Army, or holding an office of trust under the United States). Clearly, the government's interest in employment in sexually oriented businesses is not as great as its interest in such vital areas.
 
 
 66
 A recent Supreme Court opinion, Arcara v. Cloud Books, Inc., 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986), illustrates that statutes that have more than an incidental impact on speech must be strictly scrutinized--even if the statute is an attempt to fight crime. The Court in Arcara upheld a statute allowing the closure of businesses used for prostitution, even as applied to an adult bookstore. However, the reasons given by the Court for not applying strict scrutiny in Arcara illustrate that such scrutiny should apply in the current case. Arcara involved a statute of general application; the statute provided for the closure of any building found to be a public health hazard. The Court relied on the fact that the statute did not "inevitably single out bookstores or others engaged in First Amendment protected activities for the imposition of its burden...." Id. 106 S.Ct. at 3177.[6] The Court held that the First Amendment was not implicated by the statute, id. at 3178, because it imposed only an incidental burden of the exercise of free speech. Id. at 3177 (stating that the severity of the burden was "dubious at best" and was mitigated by the fact that respondents could sell their material at another location). For that reason the Court declined to apply the strictest scrutiny. Id.
 
 
 67
 The Dallas ordinance does single out those engaged in First Amendment activity and must use the least restrictive means to accomplish its legitimate purposes. The burden imposed on one denied a license is extremely heavy--for a period of years, that person is denied the ability to engage in certain speech. Before the court is willing to accept such a heavy burden as the least restrictive means, it should require that the City produce "impressive" evidence that allowing convicted felons to speak "will 'surely result in direct, immediate, and irreparable damage.' " Fernandes, 663 F.2d at 629-630 (quoting New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 2149, 29 L.Ed.2d 822 (1971) (Stewart, J., concurring)).
 
 
 68
 The majority would not place a heavier burden on the government to support the substantive licensing provisions than the zoning provisions. According to the majority, "[w]hether a license is denied because the business is improperly located or because the business is improperly maintained, the effect is the same--the operator must refrain from the activity and his only alternative is to comply with the Ordinance and obtain a license." However, a person who is prevented from speaking at one location because of a zoning restriction can move to the alternative location that must exist. A person barred from speaking because of his criminal history has no such option.
 
 
 69
 Although I understand the majority's desire to not interfere with a city that is struggling to fight crime and urban blight, I am unwilling to let that desire interfere with this court's duty to strictly analyze the methods chosen by the city when those methods directly implicate the First Amendment. Because I believe the majority has not applied the required strict scrutiny, and because some of the chosen licensing provisions and procedures cannot withstand such scrutiny, I respectfully dissent.
 
 
 
 [1]
 See Dumas v. City of Dallas, 648 F.Supp. 1061 (N.D.Tex.1986)
 
 
 [2]
 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)
 
 
 [3]
 663 F.2d 619 (5th Cir.1981), cert. dismissed, 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982)
 
 
 [4]
 Id. 380 U.S. at 58-59, 85 S.Ct. at 738-39
 
 
 [5]
 663 F.2d at 628
 
 
 [6]
 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976)
 
 
 [7]
 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)
 
 
 [8]
 Id. 106 S.Ct. at 925-27
 
 
 [9]
 Id. at 930-32
 
 
 [10]
 837 F.2d 1268 (5th Cir. 1988)
 
 
 [11]
 City of Renton, 106 S.Ct. at 930
 
 
 [12]
 Id. at 929-30 n. 2
 
 
 [13]
 Cf. Freedman, 380 U.S. at 59, 85 S.Ct. at 739 (noting that "[t]he exhibitor's stake in any one picture may be insufficient to warrant a protracted and onerous course of litigation")
 
 
 [14]
 City of Renton, 106 S.Ct. at 930
 
 
 [15]
 Id. at 930
 
 
 [16]
 682 F.2d 1203, 1214 (5th Cir.1982)
 
 
 [17]
 Contrary to Judge Thornberry's dissent, see post at 2003, Fernandes did not hold that a licensing scheme may never be used to implement a valid time, place or manner restriction on speech activity. Rather, Fernandes held that the delay in judicial review of a license denial itself impermissibly infringed on the applicant's right to speak for the duration of that delay. 663 F.2d at 628. The fact that this delay occurred in the context of licensing was not important to the court's decision. More on point is the pre-Renton decision, Genusa v. City of Peoria, 619 F.2d 1203 (7th Cir.1980). There the court upheld a zoning provision scattering adult businesses pursuant to a finding by the City of Peoria that concentrations of such businesses eroded neighborhoods. Notably, Genusa accepted the proposition that licensing requirements be treated under the same analysis as zoning. See id. at 1212
 
 
 [18]
 See Wall Distributors, Inc. v. City of Newport News, 782 F.2d 1165, 1169 (4th Cir.1986); Ellwest Stereo Theatres, Inc. v. Wenner, 681 F.2d 1243, 1246 (9th Cir.1982)
 
 
 [19]
 These included a variety of prostitution offenses: obscenity; sale, distribution, or display of harmful material to a minor; sexual performance by a child; possession of child pornography; public lewdness; indecent exposure; indecency with a child; sexual assault; aggravated sexual assault; and incest, solicitation of a child, or harboring a runaway child
 
 
 [20]
 See Consolidated Edison Co. v. Public Service Comm'n, 447 U.S. 530, 541, 100 S.Ct. 2326, 2335, 65 L.Ed.2d 319 (1980)
 
 
 [21]
 Cf. De Veau v. Braisted, 363 U.S. 144, 158-59, 80 S.Ct. 1146, 1154, 4 L.Ed.2d 1109 (1960) (plurality opinion) ("Barring convicted felons from certain employments is a familiar legislative device to insure against corruption in specified, vital areas."); 106 Forsyth Corp. v. Bishop, 482 F.2d 280, 281 (5th Cir.1973) (per curiam) (holding that the first amendment permits revocation of theatre license for violation of law against sexually explicit screenings), cert. denied, 422 U.S. 1044, 95 S.Ct. 2660, 45 L.Ed.2d 696 (1975)
 
 
 [22]
 The district court scrutinized the list of crimes that would make an applicant ineligible for a license and invalidated those it found to have no relationship to the purpose of the Ordinance. These offenses included kidnapping, robbery, bribery, controlled substances violations, and "organized criminal activities." Dumas, 648 F.Supp. at 1074
 
 
 [23]
 An individual convicted of a specified misdemeanor becomes eligible for a license two years after the conviction or end of confinement, whichever is later; for felonies or multiple misdemeanors the period is five years
 
 
 [24]
 See 663 F.2d at 630
 
 
 [25]
 Although the district court left these provisions standing, the court invalidated two sections of the Ordinance as unduly discretionary. One provision denied a license to applicants who have been "unable to operate or manage a sexually oriented business in a peaceful and law-abiding manner." The other permitted issuance of a license to applicants who, although previously convicted of a crime, are "presently fit to operate a sexually oriented business." See Dumas, 648 F.Supp. at 1072-73. The district court struck these parts from the ordinance, so they are not before us
 
 
 [26]
 See Keyishian v. Board of Regents, 385 U.S. 589, 604, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967); Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951)
 
 
 [27]
 See SDJ, Inc. v. City of Houston, supra (upholding similar ordinance provision)
 
 
 [28]
 Judge Thornberry would invalidate the requirement that licensed businesses comply with the City's health, fire and building codes as a restraint of speech unrelated to the City's stated purposes. We do not reach this issue because the Appellants' only stated attack to the code-compliance requirement was that it vested too much discretion in City officials. We have dealt fully with this argument, but we will not consider others not presented to us
 
 
 [29]
 See United States v. Biswell, 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972); Marshall v. Barlow's, Inc., 436 U.S. 307, 313, 98 S.Ct. 1816, 1820-21, 56 L.Ed.2d 305 (1978)
 
 
 [30]
 See Pollard v. Cockrell, 578 F.2d 1002, 1014 (5th Cir.1978)
 
 
 [1]
 The time, place, and manner doctrines generally only apply to regulations of speech in public forums and to zoning regulations. See generally 3 R. Rotunda, J. Nowak, & J. Young, Treatise on Constitutional Law: Substance and Procedure ch. XIII (1986)
 
 
 [2]
 Section 41-11 of the ordinance provides for the following procedures if a license is denied, suspended or revoked:
 If the chief of police denies the issuance of a license, or suspends or revokes a license, he shall send to the applicant, or licensee, by certified mail, return receipt requested, written notice of his action and the right to appeal. The aggrieved party may appeal the decision of the chief of police to a permit and license appeal board in accordance with Section 2-96 of this code. The filing of an appeal stays the action of the chief of police in suspending or revoking a license until the permit and license appeal board makes a final decision.
 
 
 [3]
 Indeed, the First Amendment grew out of a struggle in England over a system of licensing the press. See Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 630, 75 L.Ed. 1357 (1931). Although the Dallas ordinance does not apply the content-sensitive methods of the English system, "prior restraint doctrine has been invoked to strike down content-neutral permit systems that regulate protected First Amendment activities." Fernandes v. Limmer, 663 F.2d 619, 628 (5th Cir. Unit A 1981)
 
 
 [4]
 In footnote 28 the majority suggests that the Appellants have not raised this issue. The majority says that the Appellants' only attack on Section 41-5(a)(6) is that the section vests too much discretion in city officials. However, the Appellants' arguments about discretion are clearly a First Amendment challenge to Section 41-5(a)(6). Thus, the Appellants have raised the issue of the section's constitutionality. Additionally, in attacking Section 41-7, the post-licensing inspection provision, the Appellants quote Genusa in raising the issue of the city's justifications for imposing additional health, safety, and building code requirements. Thus, I would think that this court may now address whether Section 41-5(a)(6) is legitimately justified
 
 
 [5]
 I stress that I would invalidate this provision on First Amendment grounds, and I thus give no opinion regarding the Fourth Amendment challenge
 
 
 [6]
 Moreover, the Court distinguished Arcara from cases involving prior restraints because the respondent could simply move to another location to continue his bookselling. 106 S.Ct. at 3177 n. 2