## ARCARA, DISTRICT ATTORNEY OF ERIE COUNTY *v.* CLOUD BOOKS, INC., DBA VILLAGE BOOK & NEWS STORE, ET AL.

No. 85–437.   Argued April 29, 1986—Decided July 7, 1986

BURGER, C. J., delivered the opinion of the Court, in which WHITE, POWELL, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined.   O'CONNOR,

J., filed a concurring opinion, in which STEVENS, J., joined, *post*, p. 708. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 708.

*John J. DeFranks* argued the cause for petitioner. With him on the briefs were *Richard J. Arcara, pro se,* and *Louis A. Haremski.*

*Paul John Cambria, Jr.,* argued the cause and filed a brief for respondents.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether the First Amendment bars enforcement of a statute authorizing closure of a premises found to be used as a place for prostitution and lewdness because the premises are also used as an adult bookstore.

## I

## A

Respondents own and operate the "Village Books and News Store" in Kenmore, New York. The establishment characterizes itself as an "adult" bookstore and sells sexually explicit books and magazines with booths available for the viewing of sexually explicit movies. No issue is presented with respect to whether the movies or other materials available at respondents' store are obscene pornographic materials.

During September and October 1982, the Erie County Sheriff's Department conducted an undercover investigation into reported illicit sexual activities occurring on respond-

---

*Frederick A. O. Schwarz, Jr.,* and *Leonard Koerner* filed a brief for the city of New York as *amicus curiae* urging reversal.

*Steven R. Shapiro, Burt Neuborne,* and *Charles S. Sims* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

*Edward Cooper* and *James J. Clancy* filed a brief for the city of Santa Ana, California, as *amicus curiae.*

ents' premises. A Deputy Sheriff personally observed instances of masturbation, fondling, and fellatio by patrons on the premises of the store, all within the observation of the proprietor. He also observed instances of solicitation of prostitution, and was himself solicited on at least four occasions by men who offered to perform sexual acts in exchange for money. The Deputy Sheriff reported that the management of the "Village Books and News Store" was fully aware of the sexual activity on the premises. App. to Pet. for Cert. A–54, A–56, A–57, A–58.

## B

The results of the undercover investigation formed the basis of a civil complaint against respondents seeking closure of the premises under § 2321 of the New York Public Health Law. Section 2320 of the New York Public Health Law defines places of prostitution, lewdness, and assignation as public health nuisances:

> "1. Whoever shall erect, establish, continue, maintain, use, own, or lease any building, erection, or place used for the purpose of lewdness, assignation, or prostitution is guilty of maintaining a nuisance.
>
> "2. The building, erection, or place, or the ground itself, in or upon which any lewdness, assignation, or prostitution is conducted, permitted, or carried on, continued, or exists, and the furniture, fixtures, musical instruments, and movable property used in conducting or maintaining such nuisance, are hereby declared to be a nuisance and shall be enjoined and abated as hereafter provided." N. Y. Pub. Health Law § 2320 (McKinney 1985).

Section 2329 provides for the closure of any building found to be a public health nuisance under § 2320:

> "1. If the existence of the nuisance be admitted or established in an action as provided in this article, or in a

criminal proceeding in any court, an order of abatement shall be entered as part of the judgment in the case, which order . . . shall direct the effectual closing of the building, erection or place against its use for any purpose, and so keeping it closed for a period of one year . . . ." N. Y. Pub. Health Law § 2329 (McKinney 1985).

Section 2321 of the statute authorizes a suit by the district attorney, among others, to enforce its provisions.

Respondents answered the complaint by denying the allegations of the Deputy Sheriff that sexual activities occurred on the premises with respondents' knowledge, and also by asserting that a closure of the premises would impermissibly interfere with their First Amendment right to sell books on the premises. Respondents moved for partial summary judgment on these First Amendment grounds, and also advanced an argument that the statute was not intended to reach establishments other than houses of prostitution in the traditional sense. The Trial Division of the New York Supreme Court, Special Term, denied the motion for summary judgment, holding that the statute was applicable to respondents; it rejected respondents' First Amendment claims as well, reasoning that the closure order sought did not involve a prior restraint of materials presumptively protected by the First Amendment. It also held that respondents' bookselling activities could not be employed as "a curtain behind which illegal activity can be freely encouraged and conducted."

The Appellate Division, Fourth Department, affirmed. *People ex rel. Arcara* v. *Cloud Books, Inc.*, 101 App. Div. 2d 163, 475 N. Y. S. 2d 173 (1984). The Appellate Division agreed with the trial court that the statute applied to the premises in which respondents' bookstore was operated; closure of the premises would not violate the First Amendment since the admittedly unlawful conduct and activities giving rise to the abatement action were not presumptively protected expressive conduct, and respondents' sales of books on

the premises did not shield it from enforcement of the closure statute. The Appellate Division granted respondents' motion for leave to appeal to the New York Court of Appeals, and certified both the statutory question whether the statute reached establishments other than houses of prostitution and the First Amendment issue.

The New York Court of Appeals reversed. *People ex rel. Arcara* v. *Cloud Books, Inc.*, 65 N. Y. 2d 324, 480 N. E. 2d 1089 (1985). That court agreed that the Public Health Law applied to establishments other than houses of prostitution, but reversed on First Amendment grounds. The court relied on cases from other jurisdictions which analogized an order closing a bookstore or movie theater based upon previous distribution of obscene materials to an unconstitutional prior restraint. *E. g., Gayety Theatres, Inc.* v. *City of Miami*, 719 F. 2d 1550 (CA11 1983); *General Corp.* v. *State ex rel. Sweeton*, 294 Ala. 657, 320 So. 2d 668 (1975), cert. denied, 425 U. S. 904 (1976); *People ex rel. Busch* v. *Projection Room Theater*, 17 Cal. 3d 42, 550 P. 2d 600, cert. denied *sub nom. Van de Kamp* v. *Projection Room Theater*, 429 U. S. 922 (1976).

The New York Court of Appeals relied on the impact of the closure order upon respondents' protected bookselling activities, and concluded that that circumstance required scrutiny under this Court's First Amendment analysis of regulations aimed at nonspeech activity but having an incidental effect on speech. Purporting to apply the four-part test of *United States* v. *O'Brien*, 391 U. S. 367 (1968), the New York Court of Appeals determined that the closure remedy fell within the constitutional power of the State; that the closure remedy furthered a substantial state interest in thwarting prostitution; and that the purpose of the closure remedy was unrelated to the suppression of speech.

Notwithstanding that analysis, the court determined that the closure remedy failed the fourth part of the *O'Brien* test, which requires that the statute incidentally restricting

speech be no broader than necessary to achieve its purpose. The court reasoned that upon the summary judgment record before it, an order closing the premises for a year was much broader than necessary to achieve the restriction against illicit commercial sexual activities and that an injunction against continuing the admittedly illegal activity on the premises could achieve the same effect without restricting respondents' bookselling activities.

We granted certiorari.[1]  474 U. S. 978 (1985).  We reverse.

## II

This Court has applied First Amendment scrutiny to a statute regulating conduct which has the incidental effect of burdening the expression of a particular political opinion. *United States* v. *O'Brien, supra.*  In *O'Brien*, the Court considered the First Amendment ramifications of a statute which imposed criminal sanctions on one who "knowingly destroys, knowingly mutilates, or in any manner changes" a draft registration certificate.  50 U. S. C. App. § 462(b). The *O'Brien* Court noted that on its face the statute did not regulate conduct that was necessarily expressive, since the destruction of a draft card is not ordinarily expressive conduct.  The defendant in *O'Brien* had, as respondents here do not, at least the semblance of expressive activity in his claim that the otherwise unlawful burning of a draft card was to "carry a message" of the actor's opposition to the draft.  As the Court noted in *O'Brien:*

"This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of con-

---

[1] The decision of the New York Court of Appeals conflicts with decisions of the Virginia Supreme Court and the Pennsylvania Superior Court which have upheld the closure of bookstores under public health nuisance statutes based upon illicit sexual activities occurring on the premises.  *Commonwealth* v. *Croatan Books, Inc.*, 228 Va. 383, 323 S. E. 2d 86 (1984); *Commonwealth ex rel. Lewis* v. *Allouwill*, 330 Pa. Super. 32, 478 A. 2d 1334 (1984).

duct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U. S., at 376–377 (footnotes omitted).

The Court determined that the prohibition against mutilation of draft cards met these requirements and could constitutionally be applied against one who publicly burned his draft card as a symbolic protest.

We have applied *O'Brien* to other cases involving governmental regulation of conduct that has an expressive element. In *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288 (1984), we considered the application of a ban on camping and sleeping in Lafayette Park and on the Mall in Washington, D. C., to demonstrators who sought to sleep overnight in these parks as a protest of the plight of homeless people. Again in *United States* v. *Albertini*, 472 U. S. 675, (1985), we considered a protester's conviction for reentering a military base after being subject to an order barring him from entering that establishment based on his previous improper conduct on the base. In each of these cases we considered the expressive element of the conduct regulated and upheld the regulations as constitutionally permissible.

We have also applied First Amendment scrutiny to some statutes which, although directed at activity with no expres-

sive component, impose a disproportionate burden upon those engaged in protected First Amendment activities. In *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575 (1983), we struck down a tax imposed on the sale of large quantities of newsprint and ink because the tax had the effect of singling out newspapers to shoulder its burden. We imposed a greater burden of justification on the State even though the tax was imposed upon a non-expressive activity, since the burden of the tax inevitably fell disproportionately—in fact, almost exclusively—upon the shoulders of newspapers excercising the constitutionally protected freedom of the press. Even while striking down the tax in *Minneapolis Star*, we emphasized:

> "Clearly, the First Amendment does not prohibit all regulation of the press. It is beyond dispute that the States and the Federal Government can subject newspapers to generally applicable economic regulations without creating constitutional problems. See, *e. g.*, *Citizen Publishing Co.* v. *United States*, 394 U. S. 131, 139 (1969) (antitrust laws); *Lorain Journal Co.* v. *United States*, 342 U. S. 143, 155–156 (1951) (same); *Breard* v. *Alexandria*, 341 U. S. 622 (1951) (prohibition of door-to-door solicitation); *Oklahoma Press Publishing Co.* v. *Walling*, 327 U. S. 186, 192–193 (1946) (Fair Labor Standards Act); *Mabee* v. *White Plains Publishing Co.*, 327 U. S. 178 (1946) (same); *Associated Press* v. *United States*, 326 U. S. 1, 6–7, 19–20 (1945) (antitrust laws); *Associated Press* v. *NLRB*, 301 U. S. 103, 132–133 (1937) (National Labor Relations Act); see also *Branzburg* v. *Hayes*, 408 U. S. 665 (1972) (enforcement of subpoenas)." *Id.*, at 581.

## III

The New York Court of Appeals held that the *O'Brien* test for permissible governmental regulation was applicable to this case because the closure order sought by petitioner

would also impose an incidental burden upon respondents' bookselling activities. That court ignored a crucial distinction between the circumstances presented in *O'Brien* and the circumstances of this case: unlike the symbolic draft card burning in *O'Brien*, the sexual activity carried on in this case manifests absolutely no element of protected expression. In *Paris Adult Theatre I* v. *Slaton*, 413 U. S. 49, 67 (1973), we underscored the fallacy of seeking to use the First Amendment as a cloak for obviously unlawful public sexual conduct by the diaphanous device of attributing protected expressive attributes to that conduct. First Amendment values may not be invoked by merely linking the words "sex" and "books."

Nor does the distinction drawn by the New York Public Health Law inevitably single out bookstores or others engaged in First Amendment protected activities for the imposition of its burden, as did the tax struck down in *Minneapolis Star*. As we noted in *Minneapolis Star*, neither the press nor booksellers may claim special protection from governmental regulations of general applicability simply by virtue of their First Amendment protected activities. If the city imposed closure penalties for demonstrated Fire Code violations or health hazards from inadequate sewage treatment, the First Amendment would not aid the owner of premises who had knowingly allowed such violations to persist.

Nonetheless, respondents argue that the effect of the statutory closure remedy impermissibly burdens its First Amendment protected bookselling activities. The severity of this burden is dubious at best, and is mitigated by the fact that respondents remain free to sell the same materials at another location.[2] In any event, this argument proves too

---

[2] For the same reason, we must reject the Court of Appeals' reasoning analogizing the closure order sought in this case to an unconstitutional prior restraint under *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697 (1931). The closure order sought in this case differs from a prior restraint

much, since every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities. One liable for a civil damages award has less money to spend on paid political announcements or to contribute to political causes, yet no one would suggest that such liability gives rise to a valid First Amendment claim. Cf. *Buckley* v. *Valeo*, 424 U. S. 1 (1976). Similarly, a thief who is sent to prison might complain that his First Amendment right to speak in public places has been infringed because of the confinement, but we have explicitly rejected a prisoner's claim to a prison environment least restrictive of his desire to speak to outsiders. See *Pell* v. *Procunier*, 417 U. S. 817 (1974); see also *Jones* v. *North Carolina Prisoners Union*, 433 U. S. 119 (1977).

It is true that the closure order in this case would require respondents to move their bookselling business to another location. Yet we have not traditionally subjected every criminal and civil sanction imposed through legal process to "least restrictive means" scrutiny simply because each particular remedy will have some effect on the First Amendment activities of those subject to sanction. Rather, we have subjected such restrictions to scrutiny only where it was conduct with a significant expressive element that drew the legal remedy in the first place, as in *O'Brien*,[3] or where a statute based on a

---

in two significant respects. First, the order would impose no restraint at all on the dissemination of particular materials, since respondents are free to carry on their bookselling business at another location, even if such locations are difficult to find. Second, the closure order sought would not be imposed on the basis of an advance determination that the distribution of particular materials is prohibited—indeed, the imposition of the closure order has nothing to do with any expressive conduct at all.

[3] The dissent asserts that we have previously struck down "[g]enerally applicable statutes that purport to regulate nonspeech . . . if they unduly penalize speech, political or otherwise." *Post*, at 709. This is obviously a correct statement of holdings which are not relevant here. In each of the cases cited by the dissent, the "nonspeech" which drew sanctions was intimately related to expressive conduct protected under the First Amend-

nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity, as in *Minneapolis Star*. This case involves neither situation, and we conclude the First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books.

The New York Court of Appeals thus misread *O'Brien*, which has no relevance to a statute directed at imposing sanctions on nonexpressive activity. The legislation providing the closure sanction was directed at unlawful conduct having nothing to do with books or other expressive activity. Bookselling in an establishment used for prostitution does not confer First Amendment coverage to defeat a valid statute aimed at penalizing and terminating illegal uses of premises. The legislature properly sought to protect the environment of the community by directing the sanction at premises knowingly used for lawless activities.[4]

The judgment of the New York Court of Appeals is

*Reversed.*

---

ment. See *Grayned* v. *City of Rockford*, 408 U. S. 104 (1972) (demonstration results in prosecution under antinoise ordinance); *Marsh* v. *Alabama*, 326 U. S. 501 (1946) (trespass in order to distribute religious literature); *Cantwell* v. *Connecticut*, 310 U. S. 296 (1940) (breach of peace prosecution based upon distribution of religious literature). Here, however, the "nonspeech" conduct subject to a general regulation bears absolutely no connection to any expressive activity.

[4] Respondents assert that closure of their premises is sought as a pretext for suppression of First Amendment protected expression. However, there is no suggestion on the record before us that the closure of respondents' bookstore was sought under the public health nuisance statute as a pretext for the suppression of First Amendment protected material. Were respondents able to establish the existence of such a speech suppressive motivation or policy on the part of the District Attorney, they might have a claim of selective prosecution. See *Wayte* v. *United States*, 470 U. S. 598 (1985). Respondents in this case made no such assertion before the trial court.

708

JUSTICE O'CONNOR, with whom JUSTICE STEVENS joins, concurring.

I agree that the Court of Appeals erred in applying a First Amendment standard of review where, as here, the government is regulating neither speech nor an incidental, nonexpressive effect of speech. Any other conclusion would lead to the absurd result that any government action that had some conceivable speech-inhibiting consequences, such as the arrest of a newscaster for a traffic violation, would require analysis under the First Amendment. If, however, a city were to use a nuisance statute as a pretext for closing down a bookstore because it sold indecent books or because of the perceived secondary effects of having a purveyor of such books in the neighborhood, the case would clearly implicate First Amendment concerns and require analysis under the appropriate First Amendment standard of review. Because there is no suggestion in the record or opinion below of such pretextual use of the New York nuisance provision in this case, I concur in the Court's opinion and judgment.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

Respondent Cloud Books, Inc., has a bookstore that sells sexually explicit, but not allegedly obscene, publications. See *People ex rel. Arcara* v. *Cloud Books, Inc.*, 65 N. Y. 2d 324, 326, 480 N. E. 2d 1089, 1091 (1985); see also *ante*, at 698. The Court holds that the store can be shut down for one year as a nuisance if it is found to be a place "in or upon which any lewdness, assignation, or prostitution . . . exists," in violation of New York's Public Health Law §§ 2320 and 2329 (McKinney 1985). Despite the obvious role that commercial bookstores play in facilitating free expression, see, *e. g.*, *Smith* v. *California*, 361 U. S. 147, 150 (1959), the Court today concludes that a closure order would raise no First Amendment concerns, apparently because it would be triggered, not by respondents' sale of books, but by the non-

expressive conduct of patrons. See *ante*, at 698–699, and 706, n. 2. But the First Amendment, made applicable to the States by the Fourteenth Amendment, protects against all laws "abridging the freedom of speech"—not just those specifically directed at expressive activity. Until today, this Court has never suggested that a State may suppress speech as much as it likes, without justification, so long as it does so through generally applicable regulations that have "nothing to do with any expressive conduct." See *ante*, at 705–706, n. 2.

To the contrary, the Court has said repeatedly that a statute challenged under the First Amendment "must be tested by its operation and effect." *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697, 708 (1931). See also *Schad* v. *Mount Ephraim*, 452 U. S. 61, 68 (1981); *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546, 552 (1975). "In every case, therefore, where legislative abridgment of [First Amendment] rights is asserted, the courts should be astute to examine the effect of the challenged legislation." *Schneider* v. *State*, 308 U. S. 147, 161 (1939).

Generally applicable statutes that purport to regulate non-speech repeatedly have been struck down if they unduly penalize speech, political or otherwise. See, *e. g.*, *Marsh* v. *Alabama*, 326 U. S. 501 (1946) (trespass); *Cantwell* v. *Connecticut*, 310 U. S. 296 (1940) (breach of peace); *Schneider* v. *State, supra* (littering). Cf. *Grayned* v. *City of Rockford*, 408 U. S. 104, 107–108 (1972) (antinoise ordinance).

The legislation in *Marsh, Cantwell*, and *Schneider*, as in this case, did not attempt to censor particular speech, cf. *Near* v. *Minnesota ex rel. Olson, supra*, or to burden disproportionately a particular speaker, cf. *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575 (1983). The State's concern there, as here, was to preserve the character of the community through the exercise of police power. And state action was triggered not by the speech itself, but by conduct. In *Cantwell*, for example, the Court

pointed out that the speech itself "invaded no right or interest of the public." 310 U. S., at 309. Rather, the rage of the listeners led to state action. In *Schneider*, police arrested the distributors of handbills even though the litter was caused by other people throwing the handbills away. 308 U. S., at 162. In each of these cases, the State's legitimate goal in regulating the effects of speech collided with First Amendment freedoms, and the Court therefore balanced the State's interests against the burden imposed on the exercise of the fundamental right. Cf. *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50 (1976) (secondary effects of adult theaters); *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986) (same); *United States* v. *Albertini*, 472 U. S. 675, 687–688 (1985) (earlier conduct threatened military security).*

At some point, of course, the impact of state regulation on First Amendment rights becomes so attenuated that it is easily outweighed by the state interest. But when a State directly and substantially impairs First Amendment activities, such as by shutting down a bookstore, I believe that the State must show, at a minimum, that it has chosen the least restrictive means of pursuing its legitimate objectives. *E. g., Cantwell, supra,* at 308. The closure of a bookstore can no more be compared to a traffic arrest of a reporter, see *ante,* at 708 (O'CONNOR, J., concurring), than the closure

---

*Our past cases cannot sensibly be distinguished on the ground that they involved regulation of nonexpressive effects of speech, or regulation of nonspeech "intimately related to expressive conduct," *ante,* at 706, n. 3; our concern clearly has been to avoid *any* exercise of governmental power that "unduly suppress[es]" First Amendment interests. *Cantwell* v. *Connecticut,* 310 U. S. 296, 308 (1940). Would the Court feel differently about the present case if respondents had introduced evidence that the illegal sexual activity at their bookstore had been spurred by the passages read by browsing customers? Under the Court's apparent theory, paradoxically, a bookstore which sold books that induced such activity would have more protection than a bookstore whose wares had no effect on the sexual behavior of its clientele.

of a church could be compared to the traffic arrest of its clergyman.

A State has a legitimate interest in forbidding sexual acts committed in public, including a bookstore. An obvious method of eliminating such acts is to arrest the patron committing them. But the statute in issue does not provide for that. Instead, it imposes absolute liability on the bookstore simply because the activity occurs on the premises. And the penalty—a mandatory 1-year closure—imposes an unnecessary burden on speech. Of course "linking the words 'sex' and 'books,'" see *ante*, at 705, is not enough to extend First Amendment protection to illegal sexual activity, but neither should it suffice to *remove* First Amendment protection from books situated near the site of such activity. The State's purpose in stopping public lewdness cannot justify such a substantial infringement of First Amendment rights. First Amendment interests require the use of more "sensitive tools." *Speiser* v. *Randall*, 357 U. S. 513, 525 (1958).

Petitioner has not demonstrated that a less restrictive remedy would be inadequate to abate the nuisance. The Court improperly attempts to shift to the bookseller the responsibility for finding an alternative site. But surely the Court would not uphold a city ordinance banning all public debate on the theory that the residents could move somewhere else. " '[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'" *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S., at 556, quoting *Schneider* v. *State*, 308 U. S., at 163. Moreover, respondents allege that changes in local zoning laws prevent them from relocating. See Brief for Respondents 10–11; Tr. of Oral Arg. 26, 31–32. Because the statute is not narrowly tailored to further the asserted governmental interest, it is unconstitutional as applied to respondents.

The Court's decision creates a loophole through which counties like Erie, see also *New York* v. *P. J. Video, Inc.*,

475 U. S. 868 (1986); *New York* v. *Uplinger*, 467 U. S. 246 (1984), can suppress "undesirable," protected speech without confronting the protections of the First Amendment. Until today, the Court has required States to confine any book banning to materials that are determined, through constitutionally approved procedures, to be obscene. See *Marcus* v. *Search Warrant*, 367 U. S. 717 (1961); *Freedman* v. *Maryland*, 380 U. S. 51, 58–59 (1965). Until today, States could enjoin the future dissemination of adult fare as a nuisance only by "adher[ing] to more narrowly drawn procedures than is necessary for the abatement of an ordinary nuisance." See *Vance* v. *Universal Amusement Co.*, 445 U. S. 308, 315 (1980). A State now can achieve a sweeping result without any special protection for the First Amendment interests so long as the predicate conduct—which could be as innocent as repeated meetings between a man and a woman—occurs on the premises. That a bookstore might meet the heavy burden of proving selective prosecution, see *ante*, at 707, n. 4; *ante*, at 708 (O'CONNOR, J., concurring); see also *Wayte* v. *United States*, 470 U. S. 598, 607–610 (1985); *Kuzinich* v. *County of Santa Clara*, 689 F. 2d 1345, 1349 (CA9 1982); *State* v. *Flynt*, 63 Ohio St. 2d 132, 133, 407 N. E. 2d 15, 17–18, cert. granted, 449 U. S. 1033 (1980), cert. dism'd, 451 U. S. 619 (1981), hardly guarantees the prompt, constitutionally required review necessary to minimize deterrence of protected speech, see *New York* v. *P. J. Video, Inc.*, 475 U. S., at 873. And even when a State's only intention is to eliminate sexual acts in public, a 1-year closure has a severe and unnecessary impact on the First Amendment rights of booksellers.

If the freedom of speech protected by the First Amendment is to retain its "transcend[ent] value," *Speiser* v. *Randall*, 357 U. S., at 525, First Amendment interests must be given special protection. *Marsh* v. *Alabama*, 326 U. S., at 509. " 'Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being sti-

fled by more subtle governmental interference.'" *Healy* v. *James*, 408 U. S. 169, 183 (1972), quoting *Bates* v. *Little Rock*, 361 U. S. 516, 523 (1960). Since I agree with the New York Court of Appeals that the mandatory closure requirement is unconstitutional as applied to respondents, I dissent from the reversal of that court's judgment.