ADMIRAL THEATRE, etc.,
et al., Plaintiffs,

v.

CITY OF CHICAGO, et al., Defendants.

No. 91 C 3862.

United States District Court,
N.D. Illinois, E.D.

Aug. 30, 1993.

 

Michael Null, Chicago, IL, for plaintiffs.

Sharon Baldwin, Chicago, IL, for defendants.

### MEMORANDUM OPINION AND ORDER [1]

SHADUR, Senior District Judge.

On May 24, 1991 Mario Nuzzo ("Nuzzo") d/b/a the Admiral Theatre ("Admiral" [2]),

---

1. This case is assigned to, and this motion is pending on, the calendar of this Court's colleague Honorable John Nordberg. Under a procedure recently adopted by this District Court, any motions that might seek to target this opinion are to be directed to this Court, but in every other respect the case remains Judge Nordberg's.

2. This opinion will employ "Admiral" (carrying a neuter rather than a masculine pronoun) to refer both to Nuzzo as plaintiff and to the property in which the operations described here are conducted. Just which use of the term is involved in each instance should be clear from the context.

along with several of his present and former employees, filed this 12–count action in the Chancery Division of the Circuit Court of Cook County against a number of defendants: the City of Chicago ("City"), its Mayor Richard M. Daley ("Daley") and its Director of the Mayor's License Commission Winston Mardis ("Mardis") in their respective official capacities, and Bernard Riordan ("Riordan"), Jose Lara ("Lara") and Earl Olsen ("Olsen") in their individual capacities with City's Police Department. Plaintiffs seek actual and punitive damages as well as injunctive and declaratory relief by reason of defendants' claimed unconstitutional harassment and interference with plaintiffs' dissemination of sexually explicit entertainment.

After timely removal of the action to this District Court, Riordan, Lara and Olsen answered all counts of the Complaint in which they are targeted (Counts I to VI). City has answered Counts IV to VI and has filed a motion to dismiss the remaining counts of the Complaint pursuant to Fed.R.Civ.P. ("Rule") 12(b)(6). In addition to joining City's motion, Daley and Mardis ask to be dismissed entirely as defendants. For the reasons set forth in this memorandum opinion and order, Daley and Mardis are indeed dismissed out of the case, while City's motion to dismiss is denied in principal part and granted to a limited extent.[3]

### Background [4]

Admiral offers sexually-oriented entertainment to an adult audience in the form of nude and partially nude live dancing, motion pictures in two theaters, motion pictures in individual viewing booths, printed materials for sale or inspection on the premises and motion picture videotapes for sale or rent.

On February 8, 1991 Riordan, Lara and Olsen entered Admiral's premises and effected custodial arrests of all 21 dancers who were present that evening. Those dancers were detained at a Chicago Police Department station until the morning hours of February 9, 1991. Their arrests were based on the police officers' belief that the dancers' performances were—or were going to be—obscene.

Under Chapter 16–16 of City's Municipal Code ("Code") Admiral's operations are classified as an adult use, requiring that it obtain a registration before it may operate as a provider of any sexually-oriented entertainment. Code § 4–16–300 also requires Admiral to obtain a public place of amusement license before it may operate its motion picture theater or conduct its live dancing activities.

When this action was first brought, City's Zoning Ordinance §§ 9.3–2(B)(6) and 9.3–3(A)(4) restricted adult uses to what that ordinance designated as C2 or C3 zoning districts and further required that the adult use be located at least 1,000 feet from the property line of any school, church or residential zoning district. In February 1993 the Zoning Ordinance was amended so that adult uses were no longer permitted uses anywhere. Instead such uses became potentially available in zoning districts designated as C1–1 to C1–5, C3–1 to C3–7 or M1–1 to M1–5 (subject to the same 1,000–foot restrictions), but in every instance the use requires approval by City's Zoning Commission of a variation in the nature of a special use.[5] At all relevant times Admiral has been located in a zoning district designated as B2 by the Zoning Ordinance—not an "adult use" loca-

---

3. It has been fully two years since City originally filed its motion in August 1991 (because the action is not assigned to this Court's calendar, it has no idea as to why an entire year passed between that filing and the filing of plaintiffs' responsive memorandum, a period that accounts for half of the total elapsed time). One consequence of the delay has been that an intervening enactment by Chicago's City Council has mooted part of the issues posed by the Complaint. More on this subject later.

4. This section and later factual assertions are drawn from the Complaint, which must of course

be accepted as true at this stage of the proceedings (*Nelson v. Monroe Regional Medical Ctr.*, 925 F.2d 1555, 1558–59 (7th Cir.1991)).

5. No such variation has as yet been processed under the 1993 amendments to the Zoning Ordinance. Moreover, City has just substantially changed its procedures for that purpose as the result of recent litigation in which Admiral's lawyers represent another plaintiff attacking the new 1993 provisions on constitutional grounds (*BBI Enterprises, Inc. v. City of Chicago*, No. 93 C 4274).

tion under either the prior or the current version of the ordinance.

On July 15, 1990 Admiral had applied for and was later denied a public place of amusement license by City through its agents Daley and Mardis. Although no reason was provided for that denial, it was caused by City's and Daley's view that Admiral is in violation of the locational zoning restrictions for adult uses. On April 3, 1991 Admiral was served with notice that a hearing was to be held before the Mayor's License Commission as to the proposed revocation of all business and related licenses held by Admiral. That notice asserted (among other things) that (1) Admiral operated without an adult use certificate of approved registration and (2) the dancing activities of certain dancers violated various provisions of the Illinois criminal statutes and of the Code.

### Plaintiffs' Complaint

Counts I to VI of the Complaint concern the group of custodial arrests that occurred on February 8, 1991 and the threat of similar arrests in the future. Counts I and II seek both injunctive and declaratory judgment relief as to the custodial arrests of Admiral's dancers, based on the content (or anticipated content) of their dancing, before a judicial determination has been made that the dancers' expression is not constitutionally protected speech.[6] Count III seeks actual and punitive damages pursuant to 42 U.S.C. § 1983 ("Section 1983") based on defendants' alleged pattern and practice of effecting improper custodial arrests on performers such as those at Admiral. Counts IV to VI state claims for damages resulting from the alleged improper treatment of the dancers arrested on February 8, 1991 during their transport to and detention at the police station, based on harassment and retaliation, intentional infliction of emotional distress and tortious interference with business relations, respectively.

Counts VII to X of the Complaint concern zoning and licensing provisions made applicable to Admiral pursuant to the Code. Count VII challenges the constitutionality of the locational zoning restrictions placed on adult uses when the lawsuit was filed. Counts VIII and IX challenge the constitutionality of the procedures used in approving or denying an application for adult use registration and a public place of amusement license, respectively. Count X seeks a declaratory judgment that Admiral is a pre-existing nonconforming use and must therefore be allowed to continue its operations regardless of the zoning status of the area in which it is currently located.

Counts XI and XII of the Complaint challenge the constitutionality of the substance and procedures, respectively, of Code § 4–4–280 of the Code, allowing for the revocation of Admiral's licenses. City has voluntarily stayed the revocation hearing pending the outcome of this action.

### Applicable Procedural Standards

Because a Rule 12(b)(6) motion tests the sufficiency of a complaint and is not an ultimate decision on the merits (*Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.1990)), the Complaint's allegations together with all reasonable inferences from those allegations must be taken as true (see n. 4). Moreover, it has just been reconfirmed by the ultimate authority (*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, — U.S. —, —— — ——, 113 S.Ct. 1160, 1162–63, 122 L.Ed.2d 517 (1993)) that the Rules' notice-pleading regime does not call for the pleading of particularized facts or evidence (as defendants' memoranda here would have it) and that *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) is still alive and well and living in Washington—that is, the only time that dismissal is proper is if it is clear that plaintiffs can prove no set of facts consistent with their allegations that would entitle them to relief.

### Defendants Daley and Mardis

At the outset it is appropriate to deal with the separate motion by Daley and Mardis. They argue that they should be dismissed entirely because they have been sued only in

---

**6.** Count I relates to dancers who are performing or have performed at the time of such arrests. Count II deals with those dancers that have yet to perform at the time of such arrests.

their official capacities. With City a defendant in the lawsuit, the official capacity claims are said to serve no useful purpose.

■ "Official capacity" claims against officials of local government are nothing more or less than suits against the local government itself (*Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985)). Where the unit of local government is sued as well, the suit against the officials is redundant and should therefore be dismissed (*Jungels v. Pierce,* 825 F.2d 1127, 1129 (7th Cir.1987)).

That is the posture of Daley and Mardis here. Plaintiffs' only response is that the two officials would be appropriate defendants if this action were to be remanded to the state court, but that is not about to happen— and if it did in the future, that would be time enough to reinsert them as defendants. They are indeed dismissed as defendants, and from here on out this opinion will speak only of City as defendant.

*Mootness*

After City enacted the February 1993 amendments to the relevant sections of its adult use and zoning ordinances, it filed a supplemental brief on that score. In that brief City contends that Counts VII and X are now moot because the amendments changed the zoning restrictions as to where adult uses may be located, at the same time changing adult uses from "permitted" to "special" uses. City is right.

■ To be sure, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice" (*City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 1075, 71 L.Ed.2d 152 (1982)). In that respect "the crucial inquiry" is whether (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur or (2) interim events have completely and irrevocably eradicated the effects

of the alleged violation (*County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979)) or whether there is any other reason that justifies decision and relief (*Magnuson v. City of Hickory Hills,* 933 F.2d 562, 565 (7th Cir.1991)).

■ With a new and meaningfully different set of zoning restrictions and standards in place, a declaration as to the constitutionality or unconstitutionality of the superseded ordinance (as sought in Count VII) would be an impermissible advisory opinion in contravention of Article III's case or controversy requirement. As for Count X, the question whether Admiral's activities at its present location represent legal pre-existing non-conforming uses remains—but now that question arises in a materially different matrix, rather than against the backdrop of the no-longer-existing ordinance.

In fact, the same mootness problem impacts Count VIII, even though City's most recent memorandum surprisingly fails to focus on that problem. Like Count VII, Count VIII attacks the constitutionality of the now-replaced adult use ordinance restrictions: While Count VII addressed the assertedly overrestrictive locational limitations imposed by that ordinance, Count VIII asserts that First Amendment problems are created by the protracted time frame that could delay an adult use registration. In the latter respect, one salutary effect of the preliminary injunction hearing in *BBI Enterprises* (see n. 5) has been City's adoption of a set of rules and procedures that cuts back sharply on the possibility of inordinate (or untrammeled) delays in the processing of adult uses.[7] If Admiral's uses are not exempted from the new requirements as pre-existing non-conforming uses (a subject not now before this Court because of Count X's mootness), it is the constitutionality of those new requirements—and not of the superseded adult use requirements—that would have to be addressed by the parties.

---

**7.** As already stated, the old ordinance permitted such uses, but only in two zoning area classifications (not including the one in which Admiral's location falls). Under the new ordinance such uses are not permitted anywhere as such—they

must be the subject of approved zoning variations in the districts where they are potentially permitted (again Admiral's location is not within any such district).

Accordingly Counts VII, VIII and X are all dismissed as moot. Those dismissals are of course without prejudice to the potential reassertion of like claims targeting the new version of City's adult use ordinances.[8]

*Standing*

As another threshold issue on its part, City challenges plaintiffs' standing to bring Counts I, II and IX. In the area of constitutional law, standing exists where a plaintiff has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions" (*Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)).

■ As to Counts I and II City contends that plaintiffs have no standing to seek injunctive or declaratory judgment relief because they have not alleged with requisite certainty that the complained-of activities will recur. For that purpose a plaintiff must show a likelihood of repeated injury (*City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)). Past exposure to illegal conduct normally serves only as evidence bearing on the existence of a threat of repeated injury (*O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974)), because courts are generally unwilling to assume that the party seeking relief will repeat the type of misconduct that would again place him or her at a risk of suffering the injury (*Honig v. Doe*, 484 U.S. 305, 320, 108 S.Ct. 592, 602, 98 L.Ed.2d 686 (1988)).

■ But that assumption—a purely hypothetical one in such situations as that posed in the *Lyons* "chokehold" case—is really a certainty here. Admiral's whole purpose in bringing this action is to be permitted to continue its activity without interference by City. And on the Complaint's allegations City's response is equally certain and non-hypothetical. Plaintiffs allege that City has a "pattern" of effecting only custodial arrests of dancers, as opposed to the less intrusive non-custodial arrest procedures that it practices in pursuing printed obscenity charges. That "pattern" renders plaintiffs subject to the threat of future interference of their rights to perform what they claim is constitutionally protected expression.

Indeed, quite apart from that "pattern" issue this case stands in sharp contrast with *Lyons*. There the Supreme Court found that plaintiff had no standing because of the many eventualities that would have to come to pass for him again to be exposed to the complained-of conduct (461 U.S. at 105–08). Here all that has to occur for plaintiffs to suffer the alleged illegal prior restraint complained of in Counts I and II is a custodial arrest based on a police officer's belief that certain dancing is obscene. Once the police officer arrests an Admiral dancer and takes her into custody, the complained-of activity has occurred. In light of plaintiffs' allegation that the police officers conducting the arrests on February 8, 1991 had incorrect understandings of what constituted obscenity under the Constitution, plaintiffs' practice of keeping their expression within the bounds of constitutionality gives them no protection against future police interference. Moreover, plaintiffs' allegations that the police officers indiscriminately arrested all of the dancers present at Admiral that night, even if they had not yet performed, adds to the high likelihood of future arrests because it can be inferred that the police will arrest all dancers based on the performances of one or some.

■ There is another and related ground supporting plaintiffs' standing here. Past exposure to illegal conduct may establish a present case or controversy to support injunctive relief where it is accompanied by

---

8. Lest City were to launch an attack on any such renewed claims comparable to its current quarrel with Count X, it must understand (as it does not now seem to) the limited role of a Rule 12(b)(6) motion. Factual differences between the parties over what activities by Admiral may or may not have antedated the effective date of City's newly revised adult use ordinances (or of the superseded ordinances, if that remains relevant for pre-existing non-conforming use purposes) do not impact on the viability of a claim that such prior activities have given rise to vested rights.

any "continuing, present adverse effects" (*O'Shea,* 414 U.S. at 495–96, 94 S.Ct. at 676). In that respect too plaintiffs have proper standing, because the threat of self-censorship stemming from their fear of arrest for performing constitutionally-protected expression, just as they have suffered in the past, is the type of "continuing, adverse effect" that satisfies *O'Shea.*

For all those reasons, and given the special flexibility or "breathing space" that attaches to the standing doctrine in the context of the First Amendment (*Broadrick v. Oklahoma,* 413 U.S. 601, 610–12, 93 S.Ct. 2908, 2915–16, 37 L.Ed.2d 830 (1973)), plaintiffs have made a multifaceted showing of the requisite likelihood that future injury will occur, clearly giving them standing to bring Counts I and II. Compare *Sequoia Books, Inc. v. Ingemunson,* 901 F.2d 630, 633–34 (7th Cir.1990), where our Court of Appeals found standing to challenge Illinois' forfeiture provisions despite the fact that for those provisions to apply to plaintiff at least one further obscenity conviction and the holding of a forfeiture hearing had to take place.

■ To turn to the only other surviving claim as to which City questions Admiral's standing, Count IX challenges the application to Admiral of City's public place of amusement license requirement. City says that Admiral lacks standing to bring that claim because it has never sought to comply with the licensing procedures (including Admiral's failure to pursue the review procedures afforded by the ordinance on the one occasion that it applied for such a license). Again City's objection to Admiral's standing fails.

It has long been held, in the First Amendment context, "that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license" (*City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 755–56, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988); accord, *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969), quoting Chief Justice Stone's dissent in *Jones v. Opelika,* 316 U.S.

584, 602, 62 S.Ct. 1231, 1241, 86 L.Ed. 1691 (1942), adopted per curiam on rehearing, 319 U.S. 103, 104, 63 S.Ct. 890, 890, 87 L.Ed. 290 (1943) ("The Constitution can hardly be thought to deny to one subjected to the restraints of [a licensing law] the right to attack its constitutionality, because he has not yielded to its demands"). And as to City's review procedures, *Alleghany Corp. v. Haase,* 896 F.2d 1046, 1050 (7th Cir.1990) teaches that "there is no general requirement of exhausting state judicial or administrative remedies before bringing a federal suit" to challenge the propriety of an administrative decision.

All of that does not of course mean that a party may automatically challenge the facial constitutionality of every law that has any effect on its ability to practice its expression. Instead, as *Lakewood,* 486 U.S. at 759, 108 S.Ct. at 2145 puts it:

> The law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks.

All that Admiral needs to show at this stage in terms of its standing to bring a facial challenge is that the ordinance at issue in Count IX has a close enough nexus to expression-related conduct to pose the threat of censorship expressed in *Lakewood.* Although the question is not free from doubt, Code § 4–16–010 defines "amusement" as, and requires a license for, "any exhibition, performance, presentation or show for entertainment purposes, including ... any theatrical, dramatic, musical or spectacular performance, promotional show, motion picture show ... or similar exhibition such as ... dancing." By its terms that provision seeks to regulate conduct commonly associated with expression (along with non-expression-related conduct) and is therefore subject to facial attack in that respect by Admiral.

*Viability of Surviving Claims*

With that entire set of preliminary issues having been resolved, at long last this opinion can turn to the sustainability of the remaining challenged claims—Counts I to III,

IX, XI and XII—in Rule 12(b)(6) terms. They will be dealt with in sequence.

*Counts I and II*

Counts I and II assert that City lacks power to effect the custodial arrest of Admiral's dancers based upon nonjudicial determinations (that is, decisions by police officers) as to the content of their dancing (viewed as expressive conduct). Plaintiffs contend that such custodial arrests are prior restraints on constitutionally-protected speech because the dancers are prevented from engaging in their expressive conduct for the duration of the arrest. City responds that plaintiffs have failed to state a cause of action upon which relief may be granted because the Complaint's allegations, taken as true, do not amount to prior restraint.

■ Prior restraints on speech may occur in two ways. First, "[g]overnmental action constitutes a prior restraint when it is directed to suppressing speech because of its content before the speech is communicated" (*Berg v. Health & Hosp. Corp. of Marion County, Ind.,* 865 F.2d 797, 801 (7th Cir. 1989), quoting earlier decisions). That rule has been applied to strike down licensing schemes as unconstitutional prior restraints on speech where officials are given the power to restrain speech before it even occurs and is viewed by the officials (see *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 552–53, 95 S.Ct. 1239, 1243, 43 L.Ed.2d 448 (1975)). Second, a prior restraint may occur where communication is suppressed, either directly or by inducing excessive caution in the communicator, without a prior judicial determination that the speech is unprotected by the First Amendment (*Alexander v. United States,* —— U.S. ——, —— – ——, 113 S.Ct. 2766, 2771–72, 125 L.Ed.2d 441 (1993); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 390, 93 S.Ct. 2553, 2561, 37 L.Ed.2d 669 (1973)). Of course any such prior judicial determination must be accompanied by the "requisite procedural safeguards" (*Alexander,* —— U.S. at ——, 113 S.Ct. at 2772), including the requirement that any extrajudicial suppression must be based on something more than probable cause to believe the expression is obscene (*id.; Fort Wayne Books, Inc. v.*

*Indiana,* 489 U.S. 46, 66, 109 S.Ct. 916, 929, 103 L.Ed.2d 34 (1989) ("our cases firmly hold that mere probable cause to believe a legal violation has transpired is not adequate to remove [speech] from circulation").

Prior restraint law is grounded on the premise that "a State is not free to adopt whatever procedures it pleases for dealing with obscenity ... without regard to the possible consequences for constitutionally protected speech" (*Marcus v. Search Warrant,* 367 U.S. 717, 731, 81 S.Ct. 1708, 1716, 6 L.Ed.2d 1127 (1961)). Not surprisingly, then "[a]ny system of prior restraints of expression comes to [the courts] bearing a heavy presumption against its constitutional validity" (*Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963), holding that systems of prior restraint are tolerated only where operated under judicial superintendence and where an almost immediate judicial determination of the validity of the restraint is assured).

■ This is not of course to say that prior restraints are per se unconstitutional (*Southeastern Promotions,* 420 U.S. at 558, 95 S.Ct. at 1246). To find a system of prior restraint unconstitutional, it must be shown to have taken place without "procedural safeguards designed to obviate the dangers of a censorship system" (*id.* at 559, 95 S.Ct. at 1247), such as a brief period of restraint and assurance of a prompt final judicial determination of whether the speech is in fact protected by the Constitution (*id.* at 560, 95 S.Ct. at 1247).

■ Determinations as to whether any given system of civil or criminal sanction is an improper prior restraint do not end the analysis, however. Even if that question gets a negative answer, if it is still true that "it was conduct with a significant expressive element that drew the legal remedy in the first place," the system is still subjected to "least restrictive means" scrutiny to determine its constitutionality (*Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 706, 106 S.Ct. 3172, 3177, 92 L.Ed.2d 568 (1986)). Under such scrutiny the State can regulate the content of constitutionally protected speech only (1) to promote a compelling interest and (2) if it

chooses the least restrictive means to further that interest (*Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989)).

It will be recalled that on February 8, 1991 the police, consistent with their own regular pattern of conduct in such situations, arrested all of the dancers present at Admiral's premises based on the officers' belief that the dancers' expressive conduct was obscene and hence not protected by the Constitution. Count I is based on the arrest of dancers who had already begun performing that evening, while Count II concerns the arrest of dancers who were yet to perform.

■ Count II clearly states a claim. Any arrest of dancers *before* they perform, based on a belief that the content of such performances *will be* obscene, is a prior restraint no different from that implemented by the defendants (and struck down by the Court) in *Lakewood.* Advance custodial arrests based on the anticipated content of expression are plainly restraints on speech. If plaintiffs were to deliver as their Complaint has advertised, they would be entitled to the relief they request. Thus a front-end dismissal of Count II is not in order.

■ Although Count I presents a slightly closer question, there too plaintiffs have sufficiently stated a claim. Again the dancers' arrests were based on a nonjudicial determination that the *content* of their expression was constitutionally unprotected obscenity. That distinguishes this case from *Arcara*, where the seizures were based upon conduct not associated with expression and where such seizures therefore raised no First Amendment concerns. Whether or not the arrests here fit the classic prior restraint mold, the Complaint adequately alleges that custodial arrest of the dancers is not the "least restrictive means" of regulating what the parties agree is First–Amendment–protected speech (the *Arcara* test).

Of course City will be free to attempt to prove that custodial arrests are the least restrictive means of serving some compelling interest, or that its system of such arrests is accompanied by adequate safeguards to raise it from impropriety. That, however, is for

the future—for the present Count I survives. This may mean that City's police will have to deal with exotic dancers in a different fashion, but it has long been the case that the "regulation by the States of obscenity [must] conform to procedures that will ensure against the curtailment of constitutionally protected expression, which is often separated from obscenity only by a dim and uncertain line" (*Bantam Books,* 372 U.S. at 66, 83 S.Ct. at 637).

### Count III

■ Count III advances a Section 1983 damage claim based on City's alleged pattern and practice of harassment and retaliation against persons and businesses engaged in sexually oriented expression, as manifested by effecting custodial arrests such as those at Admiral on February 8, 1991. According to the Complaint City, through its agents at the highest levels of the Chicago Police Department, has had knowledge of this pattern and practice but has failed to rectify or prevent the alleged unconstitutional practices. City contends that Count III fails to state a claim because plaintiffs have not properly alleged the existence of a "custom."

In this instance a post-briefing development has undercut City's position. *Leatherman,* ——— U.S. at ——— ———, 113 S.Ct. at 1162–63 has drawn the fangs of *Strauss v. City of Chicago,* 760 F.2d 765, 767–69 (7th Cir.1985), which had previously required particularized factual pleading by plaintiffs seeking to implicate local government itself in Section 1983 responsibility for the acts of its employees. It has thus once again been confirmed by the Supreme Court that the notice-pleading regime of the Rules, and not a fact-pleading approach, remains the order of the day.

Here the Complaint alleges that City, through its Police Department, has carried out a policy of effecting custodial arrests only of nude or partially nude performers, while at the same time issuing only citations to those distributing allegedly unlawful printed materials. Its further allegation of a long-standing pattern and practice of such conduct is enough under *Leatherman* to withstand a motion to dismiss.

*Count IX*

■ This opinion has already described the Count IX claim that Code § 4–4–060, delineating the public place of amusement licensing procedures, constitutes an illegal prior restraint of First Amendment expression because City has an unconstitutionally long period in which to grant or deny a license, during which time the applicant is not allowed to conduct its speech activities. City argues that the waiting periods are not as long as those alleged by plaintiffs, nor are they unconstitutional in length.

This opinion has also adverted to the teaching of *Lakewood,* 486 U.S. at 757, 108 S.Ct. at 2144 "that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." In that respect it has long been held that any such licensing system must take place within a "specified brief period" and "must also assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license" (*Freedman v. Maryland,* 380 U.S. 51, 59, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965)).

Plaintiffs allege that Code § 4–4–060 allows City more than 100 days to approve or deny a license application and is accompanied by no procedure providing any prompt judicial review of a denial. It is of no moment that the parties disagree on the facts in that respect, for Rule 12(b)(6) focuses on what plaintiffs have alleged—and proof of those allegations would entitle plaintiffs to the relief that they seek.

*Count XI*

■ Count XI challenges the constitutionality of City's power to revoke the licenses of persons conducting current speech activities, based on the fact that some past speech has been unprotected and illegal. Code § 4–4–280 permits City to revoke the licenses of entities such as Admiral (and thus to prevent the dissemination of future speech) due to past violations involving the content of such speech. City responds that because Code § 4–4–280 allows the revocation of licenses only as punishment for past illegal conduct, its application to licensees such as Admiral is proper despite their speech activities.

At least since the seminal First Amendment decision in *Near v. Minnesota,* 283 U.S. 697, 713, 51 S.Ct. 625, 630, 75 L.Ed. 1357 (1931) it has been clear that governmental prohibition of future protected expression based on findings of past or present undesirable conduct is "the essence of censorship." Accord, such cases as *Vance v. Universal Amusement Co.,* 445 U.S. 308, 311 n. 3, 100 S.Ct. 1156, 1159 n. 3, 63 L.Ed.2d 413 n. 3 (1980) ("When that future conduct may be protected by the first amendment, the whole system must fail because the dividing line between protected and unprotected speech may be 'dim and uncertain' ").

■ That principle does not, however, preclude imposing a prohibition on future protected speech as a punishment for past speech that has been *adjudicated* to be illegal (*Alexander,* —— U.S. at ——, 113 S.Ct. at 2772). In that way the law draws a line between prior restraints and later punishments, permitting only the latter to justify such prohibitions on future speech as the forfeiture of expressive material (*id.* at ——, 113 S.Ct. at 2773). But a necessary precondition to placing governmental action on the subsequent-punishment side of that line is that the past speech that forms the basis of the prohibition must have been submitted for a prior judicial determination, together with all the required safeguards, and thereby found to be illegal speech (*id.*). Thus governmental action that punishes a speaker for conduct that has been *judicially* determined to be obscene is classified as subsequent punishment. But where future protected speech is sought to be prohibited based on the content of past speech without such a prior judicial determination that the past speech is obscene, that would constitute a prior restraint.

Count XI alleges that City is attempting to revoke Admiral's licenses based at least in part on past conduct that City asserts is obscene. Furthermore, Count XI goes on, that past conduct has never been presented for a judicial determination as to whether it came within the protection of the First

Amendment. To the extent that City is indeed attempting to revoke Admiral's license based upon judicially untested allegations of unprotected speech activities, plaintiffs state a valid cause of action under Count XI.

It should be made plain, however, that any revocation of licenses based on allegations of liquor code violations and other activities that are *not* associated with speech presents no constitutional questions and would not alone constitute a cause of action under Count XI. Hence Count XI survives City's motion to dismiss only to the extent that City's revocation hearing is based on allegations of past illegal speech that has not been judicially determined to be obscene.

*Count XII*

■ Finally, Count XII asserts the unconstitutionality of the procedures used by City to revoke the licenses, pursuant to Code § 4-4-280, of entities involved in the dissemination of constitutionally protected speech. In that respect plaintiffs allege that Code § 4-4-280 (which alone delineates the procedures to be used in revocation hearings) does not provide the procedural safeguards necessary for governmental agencies to prohibit future protected speech. For its part City contends that the requisite procedural safeguards are implicitly (though not explicitly) incorporated into Code § 4-4-280.

Essentially plaintiffs' position is that Code § 4-4-280 lacks several of the procedural safeguards required to obviate the dangers of a censorship system. Their allegations in that regard, which are not only required to be accepted on a Rule 12(b)(6) motion but are apparent from a reading of the section itself, may alone provide a sufficient basis on which plaintiffs could recover the relief they seek. City's only response is that the requisite procedural safeguards are implicit in the administrative decision-making process as a whole.

Even if that were true (an issue that need not be decided at this time), plaintiffs' allegations if proved would entitle them to relief: In the speech context "the limits the city claims are implicit in its law [must] be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice" (*Lakewood,* 486 U.S. at

770, 108 S.Ct. at 2151). On the current motion it must be accepted that none of those factors exists with respect to Code § 4-4-280, so that Count XII states a valid cause of action on that basis alone.

### *Conclusion*

Daley and Mardis are dismissed as defendants (albeit purely on procedural grounds). Counts VII, VIII and X are dismissed as moot (again solely on technical grounds). But City's motion to dismiss Counts I through III, IX, XI and XII is denied in its entirety, and City is ordered to answer those counts on or before September 16, 1993.