**TEE & BEE, INC., Plaintiff,**

v.

**CITY OF WEST ALLIS, Defendant.**

No. 92–CV–1299.

United States District Court,
E.D. Wisconsin.

Aug. 19, 1996.

Jeff Scott Olson, Olson Law Office, Madison, WI, for Plaintiff.

Scott E. Post, West Allis City Attorney's Office, West Allis, WI, for Defendant.

## DECISION AND ORDER

RANDA, District Judge.

This matter comes before the Court on defendant City of West Allis' ("the City") motion for summary judgment. For the following reasons, the City's motion is granted and the case dismissed.

## FACTS

In 1990 and 1991, the West Allis Common Council ("the Council") considered Ordinance No. 5835, which, among other things, created section 9.28 of the West Allis Revised Municipal Code. Section 9.28 was designed to regulate the operation of adult businesses in the City. The ordinance was first introduced on July 17, 1990 and was sent to the Council's License and Health Committee, where it remained until August 15, 1991. During that time, the ordinance was sent to various staff members for analysis, discussion, and revision.

The ordinance set forth the Council's factual findings and listed the studies the Council relied upon in finding the ordinance necessary. Based on those findings, the Council deemed the ordinance necessary to prevent the concentration of adult businesses and to prevent such businesses from locating near certain other uses. The Council also found it necessary to regulate and license each individual adult business in order to minimize the negative secondary effects associated with adult businesses. On August 20, 1991, the Council ("the Council") formally passed Ordinance No. 5835.

In October and November of 1991, the License and Health Committee considered amending § 9.28. On November 18, 1991, the Council passed Ordinance No. 5867 amending § 9.28. The amended ordinance defined "adult bookstore" as follows:

"Adult bookstore" means an establishment having a substantial portion of its stock in trade, for sale, rent, lease, inspection or viewing, books, films, video cassettes, magazines or other periodicals, which are distinguished or characterized by their emphasis on matters depicting, describing or relating to "specified anatomical areas," as defined below, and in conjunction therewith have facilities for the presentation of "adult entertainment," as defined below, including adult oriented films, movies, or live performances for observation by patrons therein.

The effect of this change was to classify as an "adult bookstore" only those businesses that offered the viewing of certain materials on the business premises.

On or about May 20, 1992, Tee and Bee, Inc. ("T & B") opened Super Video and Variety ("Super Video") at 9800 West Greenfield Avenue. Super Video engaged in the sale of sexually explicit books, magazines, videotapes, and other materials. Because Super Video had no facilities for the presentation of adult materials, it did not fall within the definition of "adult bookstore." This did not alleviate the public's concerns, however. In response to public anxiety concerning Super Video, the License and Health Committee considered another amendment to § 9.28. Committee meetings were held on the matter on July 16, August 13, and October 15, 1992. In addition, a public hearing was held on September 22, 1992, at which time City staff members, along with members of the public, provided additional information regarding

adult businesses in general and Super Video in particular.

On October 20, 1992, the Council passed the proposed amendment to § 9.28 which, among other things, redefined the phrase "adult bookstore":

"Adult bookstore" means an establishment which has a facility or facilities, including but not limited to booths, cubicles, rooms, or stalls, for the presentation of "adult entertainment" as defined below, including adult oriented films, movies or live performances for observation by patrons therein, or which, as part of its regular and substantial course of conduct, offers for sale, rent, trade, lease, inspection or viewing books, films, video cassettes, magazines or other periodicals, which are distinguished or characterized by their emphasis on matters depicting, describing or relating to "specified anatomical areas" or "specified sexual activities" as defined below.

In November of 1992, the City Clerk sent out a questionnaire to all of the City's known bookstores and video stores. T & B's response was to file this lawsuit on December 4, 1992, seeking a preliminary and permanent injunction enjoining enforcement of amended § 9.28. Initially, a magistrate judge issued a recommendation granting the preliminary injunction. However, on September 2, 1994, the Court declined to adopt the magistrate's recommendation, denied plaintiff's request for a preliminary injunction, and dissolved whatever preliminary injunction may have been in effect.

On September 15, 1994, T & B sought a license to operate an adult bookstore. The Council denied the plaintiff's application. In denying the application, the Council relied on provisions of amended § 9.28 which are disputed in this action. In response to the Council's denial, T & B reorganized its business so that less than fifty percent of its stock-in-trade consisted of sexually explicit material. As a result, T & B's business is no longer classified as an adult-oriented business.

## LAW

### I. SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Pro. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Summary judgment is particularly appropriate in a case challenging the facial constitutionality of a statute. *Felix v. Young,* 536 F.2d 1126, 1130, n. 7 (6th Cir.1976). The Court finds that no genuine issues of material fact are present in the record before it.

### II. STANDING

■ T & B's suit against the City presents a facial challenge to the constitutionality of § 9.28. T & B must have standing to bring such a challenge. To have standing, T & B must demonstrate concrete and specific facts indicating both that the challenged ordinance injured T & B and that court intervention would benefit T & B in a tangible way. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). T & B's standing to challenge the ordinance's constitutionality must be evaluated separately with respect to each contested provision of the ordinance. *Genusa v. City of Peoria,* 619 F.2d 1203, 1209 (7th Cir.1980). The magistrate judge concluded that T & B had standing to challenge the following provisions of § 9.28: (1) the license disability and disclosure provisions for applicants, shareholders, officers, and directors; (2) the employee permit and disclosure provisions; (3) the license revocation provisions; (4) the hours-of-operation provision; (5) the special inspection provision; (6) the employee register provision; (7) the vicarious liability provision; (8) the entertainment listing provision; and (9) the employee permit procedural provisions. This Court previously affirmed and adopted the magistrate's ruling on standing.

■ The City argues that T & B no longer has standing to challenge § 9.28 because T & B brought suit in state court seeking a declaration that Super Video no longer qualifies as an "adult business". Lacking such status,

Super Video would not be subject to the provisions of § 9.28. The Court does not believe the state court action affects T & B's standing to challenge the ordinance. T & B reorganized its business solely in response to the Council's denial of its license application to operate an adult bookstore. The Council denied the application based on provisions of the ordinance disputed in this action.[1] Moreover, it is undisputed that T & B will return Super Video to its former status as an adult bookstore should the ordinance be invalidated. Therefore, T & B has standing to contest the provisions of the ordinance.

### III. CONSTITUTIONALITY

 The First Amendment does not immunize adult-oriented businesses from regulations designed to protect public health, safety, and general welfare. *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 62, 96 S.Ct. 2440, 2448, 49 L.Ed.2d 310 (1976) (Powell, J. concurring); *Genusa*, 619 F.2d at 1214; *Chulchian v. City of Indianapolis*, 633 F.2d 27, 31 (7th Cir.1980). A municipality may regulate activities protected by the First Amendment provided the following four-part test is met: (1) the intended activity lies within the governmental body's sphere of regulatory power; (2) the regulation "furthers an important or substantial governmental interest"; (3) the governmental interest is unrelated to suppressing the content of the regulated material; and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968). A facial examination of § 9.28 indicates that all four parts of the *O'Brien* test are satisfied. First, the City clearly acted within the scope of its police power in enacting an ordinance relating to the regulation and licensing of adult-oriented establishments. *See generally Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); *Genusa v. City of Peoria*, 619 F.2d 1203 (7th Cir.1980); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *TK's Video, Inc. v. Denton County*, 24 F.3d 705 (5th Cir.1994). Second, in order to establish the presence of substantial government interests, the City need only demonstrate that, in enacting its ordinance, it relied upon evidence that "is reasonably believed to be relevant to the problem that the city addresses." *Renton*, 475 U.S. at 51–52, 106 S.Ct. at 931. The record indicates that the purpose of the City's ordinance was to further a number of substantial governmental interests, including preventing crime, promoting safe and sanitary conditions, and protecting against urban blight and decreased property values.[2] Third, the preamble of the ordinance, read together with the minutes of the Council's September 22, 1992 meeting, indicate that the purpose of enacting § 9.28 was to combat the deleterious "secondary effects" of adult-oriented establishments.[3] Thus, the contested ordinance is a "content-neutral" time, place, and manner restriction as opposed to a

1. The reasons for the denial were as follows: (1) Conviction of T & B for Possession of Drug Paraphernalia with Intent to Deliver, an offense involving moral turpitude under § 9.28(4)(a)(2)(iii); (2) Conviction of T & B for *Exposing a Minor to Sexually Explicit Material*, a violation of §§ 9.28(4)(a)(2)(ii) & 9.28(4)(a)(2)(iii); and (3) Failure of T & B to cooperate with the licensing process, a violation of § 9.28(e).

2. The substantial government interests furthered by the separate provisions of the ordinance will be discussed in more detail *infra*.

3. In making this determination, the Council relied on findings from the locales of Indianapolis, Indiana; Austin, Texas; Chattanooga, Tennessee; Newport News, Virginia; Marion County, Indiana; Detroit, Michigan; and Seattle, Washington. These studies found that adult businesses are predisposed to the creation of unsafe and unsanitary conditions; that operators and employees of adult business tend to participate in various offenses—particularly sex-related offenses—on the premises of such establishments; that adult businesses create a substantial law enforcement problem; and that the operational characteristics of adult businesses have a deleterious effect on surrounding areas, resulting in neighborhood blight and reduced property values, especially when such businesses are concentrated in one area.

"content-based" prior restraint of speech.[4] "Reasonable regulations of the time, place, and manner of protected speech, where those regulations are necessary to further significant governmental interests, are permitted by the First Amendment." *Young*, 427 U.S. at 63, n. 18, 96 S.Ct. at 2449, n. 18. The remaining test is whether the restrictions imposed by the ordinance are "no greater than essential" for furtherance of the government interest. While the Court finds this element to be satisfied as well, the analysis is more involved, as the extent of the imposed burden must be evaluated with respect to each of the ordinance's contested provisions.

### A. *Genusa*

In this regard, T & B generally contends that all non-locational provisions of the City's ordinance are unconstitutional, relying on the invalidation of similar requirements in the case of *Genusa v. City of Peoria*. In *Genusa*, the 7th Circuit struck down as unconstitutional several licensing and permit provisions similar and/or identical to those involved in the case at bar. *Genusa*, 619 F.2d at 1221. However, as the Court indicated in its prior decision on the injunction issue, *Genusa* is distinguishable from the case at bar in two important respects.

First, the *Genusa* ordinance had as its only express purpose the "scattering" of adult establishments in order to avoid the undesirable consequences associated with their concentration in a single area. *Id.* at 1208–09. The 7th Circuit thus struck down various inspection, investigation, disclosure, and employee permit requirements, along with various standards for the issuance and revocation of licenses, because they bore no rational relation to the express goal of "inverse or scatter zoning". *Id.* at 1212–22. In other words, the various licensing and permit requirements were "unrelated to the City's stated goal of preventing adult businesses from congregating in one location." *TK's Video*, 24 F.3d at 710. Here, the purposes of the ordinance exceed that of mere "scatter

zoning". A primary purpose of the ordinance is to mitigate the deleterious secondary effects associated with adult businesses. For instance, one important purpose of the ordinance is to prevent crime—specifically, crimes of a sexual nature—that are often associated with both the patrons and the operators of adult establishments. Another purpose is to prevent the unsanitary and often unsafe conditions of such businesses. Unlike the ordinance in *Genusa*, these purposes are directed at "curtailing side effects not simply of clusters of adult businesses, but of each adult business." *TK's Video*, 24 F.3d at 710. In fact, the 5th Circuit relied upon this important distinction to uphold the very type of regulations involved in the case at bar and struck down in *Genusa*. *Id.*

Second, the *Genusa* court noted that the record before it was devoid of any evidence that adult establishments presented other types of dangers posited by the City but not mentioned in the ordinance's preamble. *Genusa*, 619 F.2d at 1214–20. Here, the ordinance references factual studies and experiences from other cities supporting such a connection. Evidence gleaned from such studies is a sufficient basis for local regulation. Courts have repeatedly held that local municipalities need not conduct their own studies on areas of important local concern, but instead may rely on studies performed in other locales. *City of Renton*, 475 U.S. at 51–52, 106 S.Ct. at 931; *Suburban Video, Inc. v. City of Delafield*, 694 F.Supp. 585, 590 (E.D.Wis.1988). The record is replete with information showing that the City determined it necessary to provide for the licensing and regulation of adult-oriented businesses in order to combat the secondary effects of such facilities in the surrounding community. For these reasons, the Court finds that the 7th Circuit holding in *Genusa* does not compel the invalidation of all non-locational regulatory provisions. Rather, the *Genusa* court invalidated several non-locational ordinance provisions because the city failed to prove that the non-locational regula-

---

**4.** The United States Supreme Court holds that "at least with respect to businesses that purvey sexually explicit materials, zoning ordinances designed to combat the undesirable secondary effects of such businesses are to be reviewed under the standards applicable to 'content neutral' time, place, and manner regulations." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 49, 106 S.Ct. 925, 929–30, 89 L.Ed.2d 29 (1986) (footnote omitted).

tions were designed to further a substantial government interest unrelated to the content of the regulated material. *Genusa,* 619 F.2d at 1219.

### B. Licensing and Permit Requirements
### 1. The license and permit.

 The ordinance requires that a license be obtained before an adult-oriented establishment may be operated in the City. § 9.28(2)(a). The ordinance further mandates that all employees in adult businesses must have permits. § 9.28(5). Requiring an adult-oriented establishment to secure a license and its employees to secure permits is constitutional provided such regulations serve substantial governmental purposes and are not unduly burdensome. Both the license and the permit requirements in the ordinance satisfy these requirements. The City cited numerous purposes for implementing the ordinance, including deterring the spread of AIDS, preventing crime, and maintaining property values. The findings further illustrate that "operators and employees of said establishments have been found to have participated in various offenses, including, but not limited to, sex-related offenses, at such establishments," and that licensing adult businesses and their employees is necessary "to minimize the impact of . . . secondary effects known to be associated with said adult-oriented establishments. . . ." The Court finds that these purposes constitute substantial government interests under *Renton.*

 The City also has an obvious and substantial interest in preventing the violation of the ordinance itself. Licensing is considered a valid means by which to ensure adherence to ordinance provisions. *See Genusa,* 619 F.2d at 1212–13. Furthermore, a licensing scheme similar to that presented by the West Allis ordinance was upheld in *T.K.'s Video:*

> The requirement that all owners of a sexually oriented business be licensed is reasonable. It serves as a means to enhance the likelihood that owners of the business will comply with the order's regulations and will not knowingly allow their establishments to be used as places of illegal

sexual activity or solicitation. The requirement that clerks and employees of a sexually oriented business be licensed is also reasonable. This requirement bears a reasonable relationship to the stated purpose of the order by preventing the spread of sexually transmitted diseases and illegal sexual activity. Both requirements are narrowly tailored and impose no greater restriction on First Amendment freedoms than is necessary to further the county's substantial interest.

*T.K.'s Video, Inc. v. Denton County,* 830 F.Supp. 335, 343 (E.D.Tex.1993), *vac'd-in-part on other grounds,* 24 F.3d 705 (5th Cir.1994). The Court agrees and finds that the licensing and permit requirements involved in this case are reasonably well-tailored toward furthering the City's substantial interest in preventing the specific harms articulated in the ordinance. The general license and permit requirements of the ordinance are therefore constitutional.

### 2. Disclosure requirements.

 In order to obtain an operating license, the applicant must provide the City with information including: (1) the applicant's name, aliases, address, and date of birth; (2) similar information for any directors, officers, and shareholders holding more than a ten percent stock interest; (3) the nature of the proposed adult business and expected address; and (4) whether the named individuals currently operate or previously operated another adult-oriented business. § 9.28(4)(a). In order to obtain an employee permit, the employee must provide the following data: (1) name, aliases, age, and address; and (2) whether he or she has ever had such a license or permit revoked or suspended. § 9.28(6)(a) & (b). T & B contends that this portion of the ordinance should be invalidated because the City did not establish a relationship between the mandated disclosure of information and a substantial government interest. This assertion is without merit. In the preamble of its ordinance, the City cites findings indicating that criminal activity, and particularly criminal activity of a sexual nature, increases in the areas surrounding adult businesses, and

that some of that activity is linked to the operators and employees of such establishments. As the court in *TK's Video* reasoned:

> Disclosure of owner and employee personal history might not be tailored to locating adult businesses, but it does monitor persons with a history of regulatory violations or sexual misconduct who would manage or work in them. These histories are plainly correlated with the side effects that can attend these businesses, the regulation of which was the legislative objective. In more legalistic and abstract terms, ends and means are substantially related. Insisting on this fit of ends and means both assures a level of scrutiny appropriate to the protected character of the activities and sluices regulation away from content, training it on business offal.

*TK's Video*, 24 F.3d at 710.

T & B argues, however, that the stockholder licensing and disclosure requirements are unconstitutional because they restrict more First Amendment freedoms than is necessary for the furtherance of the City's interest.[5] In support of this contention, T & B relies on the invalidation of a similar provision by the district court in *T.K.'s Video*. See *T.K.'s Video*, 830 F.Supp. at 335. *T.K.'s Video* is distinguishable from the case at bar in this respect. The district court in *T.K.'s Video* invalidated the portion of the provision mandating stockholder disclosure because it required that "all stockholders regardless of their interest must be licensed even if their interest is merely *de minimis* . . . ." *Id.* at 343. Conversely, another federal court upheld disclosure requirements for "each indi-

vidual who has a 20 percent or greater interest in the business." *See Dumas v. City of Dallas*, 648 F.Supp. 1061 (N.D.Tex.1986), *aff'd sub nom, FW/PBS, Inc. v. City of Dallas*, 837 F.2d 1298 (5th Cir.1988), *vac'd-in-part on other grounds*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). The important distinction seems to be the setting of a minimum level of interest in the adult-oriented establishment in order to ensure that an individual shareholder is not subjected to regulation when he or she possesses a mere *de minimus* interest. The City safeguarded against such a result by requiring a license for shareholders holding more than ten percent of the corporation's stock.[6] Therefore, the stockholder and other disclosure and license requirements are constitutional.

### 3. Standards for issuance of license.

For a corporate applicant to receive a license to operate an adult-oriented business, the following must be true: (1) all officers, directors, and shareholders must be at least eighteen years old; (2) none of the above-named persons shall have violated § 9.28 within five years preceding the application date; and (3) none of the above-named persons shall have a conviction for offenses of moral turpitude, prostitution, obscenity or other sex-related offense within five years preceding the application date, unless the individual has been pardoned. § 9.28(4)(a)(2)(i)–(iii). These standards do not vest overly-broad discretion in any governmental figure, as they consist of objectively determinable facts. *FW/PBS*, 837 F.2d 1298, 1305–06 (5th Cir.1988), *vacated in part*

---

5. Because the City's disclosure provision seeks to control the secondary effects of adult-oriented businesses, its purpose goes beyond mere notice and accountability concerns. Such a provision was struck down with respect to shareholder disclosure requirements in *Acorn Investments, Inc. v. City of Seattle*, 887 F.2d 219, 226 (9th Cir.1989). Unlike the case at bar, the government in *Acorn* did not articulate concern about the possibility of owners and shareholders of adult-oriented businesses having recent convictions for sex-related offenses. Rather, the concern centered around notifying owners and shareholders about ordinance violations. Consequently, the court in *Acorn* invalidated the shareholder disclosure provision because prompt notification to shareholders of ordinance violations

was not substantially related to ensuring compliance with the ordinance, given that shareholders are not legally responsible for a corporation's management. *Id.*

6. While the Court recognizes that the interest level set by the City (greater than 10%) is lower than that set by Denton County in *Dumas* (20%), the main concern is that licensing and disclosure requirements not attach to shareholders whose interests are *de minimis*. Drawing lines in this regard may be somewhat arbitrary, but the Court believes the City acted reasonably in limiting the reach of the ordinance to shareholders with greater than a ten percent interest in the corporation.

*on other grounds,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *Keyishian v. Board of Regents of University of State of N.Y.,* 385 U.S. 589, 603–04, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967).

 An individual's past actions are very often the best indicator of that person's future actions. Denying licensure to individuals who have recently violated an adult-oriented business ordinance is a reasonable means by which to ensure that those licensed to operate adult businesses will respect and abide by the provisions regulating the business. Likewise, when an individual has been convicted of specified crimes that relate to the "crime-control intent" of the ordinance, a municipality may deny licensure. *Dumas,* 648 F.Supp. at 1073.[7] In *Dumas,* the 5th Circuit agreed with the district court's analysis in this regard:

> ... the city's findings demonstrate a compelling interest in limiting the involvement of convicted persons in the operation of sexually oriented businesses; that by documenting the strong relationship between sexually-oriented businesses and sexually-related crimes, the City established a compelling justification for barring those prone to such crimes from the management of these businesses. The argument would continue that the City's findings conform with the well-accepted notion that the government may attach to criminal convictions disabilities aimed at preventing recidivism.

*FW/PBS, Inc. v. City of Dallas,* 837 F.2d at 1305. As mentioned previously, the City has a substantial interest in preventing crimes associated with adult-oriented establishments, particularly crimes of a sexual nature.

The constitutionality of the ordinance's civil disability provision consequently turns on whether the standards for license denial are sufficiently well-tailored to furthering the City's interest.

 "Persons with prior criminal records are not First Amendment outcasts." *Fernandes v. Limmer,* 663 F.2d 619, 630 (5th Cir.1981). However, courts have upheld civil disability provisions denying adult-oriented business licenses to individuals who have been convicted of certain sex-related offenses within a specified period of time. *See T.K.'s Video,* 830 F.Supp. at 345; *FW/PBS,* 837 F.2d at 1305. T & B argues that the City's civil disability provision is not sufficiently well-tailored because the "moral turpitude" language extends the scope of the disability beyond sex-related offenses. In support of this contention, T & B refers to the treatment of a similar civil disability provision in *FW/PBS,* 837 F.2d at 1305. In upholding that provision, the *Dumas* court narrowed it, invalidating five of the enumerated crimes on the grounds that they were not sufficiently related to the purpose of the ordinance. *Dumas,* 648 F.Supp. at 1074.[8] The remaining crimes, deemed by the 5th Circuit to be "related to the kinds of criminal activity associated with sexually oriented businesses," were all of a sexual nature. *FW/PBS,* 837 F.2d at 1305.

 In examining the City's civil disability provision with respect to what types of criminal convictions will render an applicant ineligible for a license, the Court must look closely at the plain language of the provision. When no reported state court decisions construing the language exist, a federal court

---

7. The *Dumas* court expanded the holding of *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986). In *Arcara,* the U.S. Supreme Court upheld the closing of an adult-oriented establishment where it was found that the management of the establishment was aware that illegal sexual activity was occurring on the premises. *Id.,* 478 U.S. at 704–05, 106 S.Ct. at 3176. The *Dumas* court stated that "[i]f violation of law by a licensee may permissibly justify closure, it follows inescapably that one who has been convicted of a sex-related crime may be denied licensure." *Dumas,* 648 F.Supp. at 1074, n. 34.

8. It was actually the district court which invalidated the provisions at issue; the 5th Circuit later affirmed the district court holding in *FW/PBS.* The five crimes which were eliminated from the list of offenses included the following: "(1) a controlled substances act violation, (2) bribery, (3) robbery, (4) kidnapping, or (5) organized criminal activity...." *Dumas,* 648 F.Supp. at 1074. T & B emphasizes the invalidation of the controlled substances provision because one of the City's reasons for denying T & B's license application was the fact that T & B had been convicted of Possession of Drug Paraphernalia with Intent to Deliver, cited by the City as a crime involving "moral turpitude".

must examine all the data before it and decide the matter according to how it believes the highest state court would decide. *Green v. J.C. Penney Auto Ins. Co., Inc.*, 806 F.2d 759, 761 (7th Cir.1986). Under the City's civil disability provision, ineligibility results from a conviction "of any offense involving moral turpitude, prostitution, obscenity or other offense of a sexual nature in any jurisdiction within five (5) years immediately preceding the date of the application." § 9.28(4)(a)(2)(iii). This language is made subject to §§ 111.321, 111.322, and 111.335 of the Wisconsin Statutes. Most significantly, § 111.335 states the following:

> Notwithstanding s. 111.322, it is not employment discrimination because of conviction record, to refuse to employ or license, or to bar or terminate from employment or licensing, any individual who:
>
> 1. Has been convicted of any felony, misdemeanor or other offense the circumstances of which substantially relate to the circumstances of the particular job or licensed activity.

Wis.Stat. § 111.335(1)(c).

The foregoing allows municipalities to discriminate in the issuance of licenses on the basis of prior criminal convictions, but only if the prior conviction involves an offense substantially related to the activity being licensed. The civil disability provision of § 9.28 is expressly made subject to the foregoing statute. Accordingly, the Court interprets the phrase "any offense involving moral turpitude, prostitution, obscenity or other offense of a sexual nature" as including only offenses of a sexual nature. This interpretation is further supported by the fact that the most logical reading of the provision is that the phrase "or other offense of a sexual

nature" modifies all three offenses preceding it.[9]

Courts have held that, when the civil disability provision of an adult-oriented business ordinance is tailored to apply to sex-related crimes only, the "relationship between the offense and the evil to be regulated is direct and substantial." *FW/PBS, Inc.*, 837 F.2d at 1305; *see also TK's Video*, 24 F.3d at 711. Findings specified by the City in the ordinance confirm that the presence of adult-oriented businesses in a neighborhood has been connected to an increase in crimes of a sexual nature. Therefore, the Court finds that the City's civil disability provision is facially constitutional.[10] As construed, the provision denies a license based only on convictions for sex-related crimes. Furthermore, after five years has elapsed, an individual with a prior criminal conviction may once again be eligible. These built-in limitations on the scope of the provision ensure that licenses are denied only when the applicant has recently participated in the type of criminal activity associated with adult-oriented establishments, precisely the sort of activity which the ordinance seeks to impede.

### 4. License and permit fee.

■■ Provided that the license and permit requirements are valid, a municipality may collect fees to mitigate the administrative costs of such regulation. *Murdock v. Com. of Pennsylvania*, 319 U.S. 105, 114, n. 8, 63 S.Ct. 870, 875, n. 14, 87 L.Ed. 1292 (1943); *Genusa*, 619 F.2d at 1213. The West Allis ordinance sets its license fee at $500, with $250 being returned to the applicant if the license is denied. § 9.29(8)(a). The employee permit fee is set at $50, with $25 being returned if the permit is denied. § 9.28(8)(b). Similar fees have been upheld

---

**9.** A contrary reading would interpret the phrase "or other offenses of a sexual nature" as modifying only the offense of obscenity. However, this reading is illogical given that the offense of obscenity is preceded by the offense of prostitution, which is clearly another offense of a sexual nature. A better reading of the provision is that it enumerates moral turpitude, prostitution, and obscenity as specific examples of sex-related crimes, but not the only sex-related crimes that will render an applicant ineligible for a license.

**10.** While the ordinance is facially constitutional under the Court's interpretation, the effect of the Court's reading of the provision is to invalidate one of the reasons for denying T & B's license. Conviction for Possession of Drug Paraphernalia with Intent to Deliver is not an offense involving moral turpitude under the Court's reading of the ordinance, as it is not a sex-related offense. However, the City's other reasons for denying T & B a license remain valid, particularly the fact that T & B was previously convicted of exposing a minor to sexually explicit material, a sex-related offense. (See footnote 1, *supra*).

as constitutional. In *T.K.'s Video*, the district court held that both a $500 business licensing fee and a $50 employee licensing fee were reasonably related to the administrative costs of issuing the licenses. *T.K.'s Video*, 830 F.Supp. at 345. A $100 licensing fee was upheld in *Genusa*. *Genusa*, 619 F.2d at 1213. In the absence of an argument from T & B that the City's fee schedule is excessive, the Court finds that the license and permit fees are reasonably related to the administrative and enforcement costs associated with the regulatory process.

### 5. Display of permit provision.

█ An employee permit must be carried by the employee and displayed upon request to authorized individuals. § 9.28(9)(b). The Court has already found that the permit requirement for employees of adult-oriented establishments is constitutional. The requirement that employees retain possession of the secured permit is a rational and logical means by which the City may enforce its ordinance and ensure that only authorized employees are working at any given time. Accordingly, the Court upholds this provision.

### 6. Renewal of license or permit provisions.

█ T & B contests the license and permit renewal provisions which require the West Allis Police Department to file information about operators and employees of adult-oriented businesses with the City Clerk. See §§ 9.28(10)(c) & 9.28(10)(f). The Court finds that, coupled with the licensing and permit provisions, these provisions are well-tailored to the City's goals of preventing crime and preserving the quality of neighboring communities. The provision is merely another means of gathering information about renewal applicants such that an educated decision may be made concerning their eligibility for continued operation of, or employment in, an adult-oriented business.

T & B also contests the provisions relating to employee permit renewal. Employee permits are renewable every year, so long as applications for renewal are filed at least sixty days before the permit expires.

§ 9.28(10)(d). The permit renewal fee is $50, with $25 being returned if the application is denied. § 9.28(10)(e). T & B does not argue that the time limitations are unreasonable, nor that the fee is excessive. Rather, T & B claims that the entire employee permit scheme is invalid under *Genusa*. However, as the Court previously stated, the case at bar is distinguishable from *Genusa* in that the City has shown a substantial government interest in licensing employees as a means to control the deleterious secondary effects of adult-oriented establishments. Furthermore, the Court has found that the permit requirement is well-tailored towards furthering that interest. While T & B characterizes the permit scheme as onerous because it prevents the business from replacing outgoing employees immediately, "hiring difficulties do not translate into constitutional infirmities." *Clampitt v. City of Ft. Wayne*, 682 F.Supp. 401, 406 (N.D.Ind.1988), *aff'd*, *Oriental Health Spa v. City of Ft. Wayne*, 864 F.2d 486 (7th Cir.1988). Accordingly, the Court upholds these provisions of the City's ordinance.

█ Employee permits are not transferrable. § 9.28(11)(e). The non-transferrable nature of an employee permit is consistent with the City's legitimate interest in preventing crime. Requiring employees to secure permits assists the City in denying a permit to any employee whose record contains a sex-related offense and assures the City that only employees without convictions for crimes of a sexual nature are working in adult-oriented establishments. This interest can only be furthered if permits are employee-specific; allowing permits to be transferrable would defeat the purpose of the permit requirement. For these reasons, the Court finds § 9.28(11)(e) constitutional.

### 7. License revocation provisions.

█ An operator may have its license suspended or revoked if he or she employs an individual or independent performer who has not secured the required permit. § 9.28(12)(a)(4). Further justification for revocation or suspension of a license include: (1) violation of the ordinance by the operator or any employee/entertainer of the operator,

§ 9.28(12)(a)(2); (2) the serving or consumption of intoxicating liquors or fermented malt beverage on the premises, § 9.28(12)(a)(6); and (3) selling or showing adult material to a minor. § 9.28(12)(a)(7). If the Council believes that a violation has occurred, it will issue the operator written notice of revocation, at which time the operator may request a hearing to review the revocation. § 9.28(12)(b).

The Court has stated above that the denial of a license to individuals that have recently violated the ordinance or have recently committed a sex-related crime is sufficiently well-tailored to the stated purpose of preventing sex-related crimes. It follows that if a license may be denied initially on these grounds, commission of such offenses after a license is issued is grounds for revocation or suspension of that license. Furthermore, the revocation proceedings provide for procedural safeguards in the form of both written notice of license revocation/suspension and a hearing. The license revocation provisions of the City's ordinance are valid.

### C. Other Contested Provisions

#### 1. Hours of operation provision.

■ Under the City's ordinance, adult-oriented establishments are not permitted to operate between the hours of 2:00 a.m. and 8:00 a.m., Monday through Friday, between 3:00 a.m. and 8:00 a.m. on Saturdays, and between 3:00 a.m. and 12:00 noon on Sundays. § 9.28(14)(a). Ordinances restricting the hours of operation in adult-oriented establishments have been upheld on numerous occasions. See Star Satellite, Inc. v. City of Biloxi, 779 F.2d 1074 (5th Cir.1986) (upheld adult business ordinance which restricted hours of operation to 10:00 a.m. to 12 midnight, Mondays through Saturdays, with no hours of operation allowed on Sundays); Broadway Books, Inc. v. Roberts, 642 F.Supp. 486 (E.D.Tenn.1986) (upheld hours of operation provision which mandated that adult businesses be closed between the hours of 3:00 a.m. and 8:00 a.m. on weekdays and between 3:00 a.m. and 12:00 noon on Sundays).

The record indicates that, in enacting the adult-oriented business ordinance, the City included the goals of preventing crime and preserving the quality of neighborhoods in the list of governmental interests at stake. The Court finds that the manner in which the City seeks to regulate the hours of adult businesses rationally relates to the goal of preventing crime. The restricted hours of operation fall within the period of time when crime is more likely to occur and law enforcement personnel are more likely to be busy with other matters. Furthermore, the hours of operation relate to the goal of preserving the quality of neighborhoods because they provide special precautions during those times when people are generally sleeping and when peaceful enjoyment of the home is most important. The prescribed schedule is not overly burdensome, as it allows for normal operation during a large portion of each day. Furthermore, the closing hours for adult businesses imposed by the ordinance are consistent with the closing hours of taverns, another highly-regulated business. See Wis. Stat. §§ 125.32(3) & 125.68(4). In reviewing a similar provision, the court in Ellwest Stereo Theater, Inc. v. Boner, 718 F.Supp. 1553, 1577 (M.D.Tenn.1989), held that "the required closure of these adult-oriented establishments for a few hours each day is only a minimum infringement on the plaintiffs' First Amendment rights and is justified by the difficulty of policing and enforcing the ordinance in the wee hours of the morning." Similarly, the hours restriction imposed by the City's ordinance is content-neutral, aims at combating the deleterious secondary effects of adult-oriented establishments, and only mandates closure for a few hours each day. The Court concludes that the restrictions are narrowly tailored to further the City's articulated goals of preventing crime and preserving the quality of neighborhoods.

#### 2. Inspection and enforcement provisions.

■ The West Allis ordinance provides that "adult-oriented establishments shall be open to inspection at all reasonable times by the West Allis Police Department, the Building Inspector and the Health Department." § 9.28(14)(B). In another section of the ordinance, the Police Department is given authorization to enter an adult-oriented establish-

ment "at all reasonable times to inspect the premises and enforce this section." § 9.28(21). The imposition of these inspection provisions as a means of enforcing the ordinance is constitutionally sound. *T.K.'s Video,* 830 F.Supp. at 345; *FW/PBS,* 837 F.2d at 1306. In upholding a similar provision, the 5th Circuit held that "sexually oriented businesses face a degree of regulation that renders the inspection provision presumptively reasonable." *FW/PBS,* 837 F.2d at 1306. As an added safeguard, the ordinance imposes a requirement that all inspections occur at "reasonable times". A similar provision was struck down in *Genusa* only because the government "failed to demonstrate that the special inspection provisions further a legitimate interest 'unrelated to the suppression of free expression.'" *Genusa,* 619 F.2d at 1214, *quoting O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. Here, the City's provision suffers from no such deficiency. The Court upholds the provision, finding that the inspection and enforcement provisions of the ordinance are well-tailored not only to the City's substantial interest in preventing criminal activity from occurring on the premises of adult-oriented businesses, but also to the City's interest in preventing ordinance violations.

### 3. Open booth provision.

■ Under the City's ordinance, booths for private viewing of adult oriented entertainment must have one side completely open such that a person occupying the booth may be seen from the aisle at all times. § 9.28(15)(b). In its complaint, T & B contended that the open booth provision was invalid based on both the First Amendment and the Videotape Privacy Protection Act. For the purposes of the preliminary injunction, T & B withdrew its claim with respect to the invalidity of the open booth provision. Subsequent to this withdrawal, T & B made no further argument with respect to the open booth provision. Under these circumstances, the Court will treat this claim as abandoned. However, even if T & B had not abandoned its claim regarding the validity of the open booth provision, precedent upholding similar provisions under similar circumstances makes it clear that the booth provisions are

valid. *See Matney v. County of Kenosha,* 86 F.3d 692 (7th Cir.1996); *Libra Books, Inc. v. City of Milwaukee,* 818 F.Supp. 263 (E.D.Wis.1993); *Suburban Video, Inc. v. City of Delafield,* 694 F.Supp. 585 (E.D.Wis. 1988).

### 4. Operator responsibility provisions.

■ The City's ordinance mandates that employers maintain an employee register which lists employee personal information, including name, aliases, home address, phone number, age, birth date, sex, height, weight, hair and eye color, dates employment began and terminated, and employee duties. § 9.28(16)(a). In furthering its interest of preventing crime, the City has a substantial need to notify license holders of ordinance violations committed by their employees. *Ellwest Stereo Theater,* 718 F.Supp. at 1566; *City of Colorado Springs v. 2354 Inc.,* 896 P.2d 272, 291 (Colo.1995). An employee register serves this purpose, as well as providing the City with a tracking device to verify that only authorized employees are working in adult-oriented establishments. The Court finds that the use of an employee register is constitutionally valid as a well-tailored means to further the important governmental goal of crime prevention.

■ Owners and operators must post a list of the titles and prices of all entertainment provided at an adult-oriented establishment and present this list to authorized persons upon request. § 9.28(16)(d). A similar provision was upheld in *Broadway Books,* 642 F.Supp. at 495. The posting requirement relates to the City's interest in combating increased crime, one of the deleterious secondary effects associated with adult-oriented establishments. The specific crime targeted by the City in this particular provision seems to be obscenity. Obscenity was also specifically addressed under the ordinance's licensing provisions as a sex-related offense which disqualifies an applicant, thus indicating that obscenity offenses are of particular concern. A posted list of available entertainment at each adult-oriented establishment provides a means by which authorized persons may inspect for obscenity viola-

tions. This provision is reasonably necessary and well-tailored to a substantial government interest. As such, it is constitutional.

### 5. Other ordinance provisions.

T & B does not specifically contest the remaining provisions of the City's ordinance and it is therefore unnecessary for the Court to address their constitutionality.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Defendant's motion for summary judgment is granted and the case is dismissed.

SO ORDERED.